641 So.2d 1040 (1994)
Mardra EDWARDS, Plaintiff-Appellee
v.
K & B, INC. d/b/a K & B Drug Store and the Kemper Insurance Company, Defendants-Appellants.
No. 26002-CA.
Court of Appeal of Louisiana, Second Circuit.
August 17, 1994.
*1042 Bodenheimer, Jones, Klotz & Simmons by David A. Szwak, Shreveport, for K & B, Inc. and American Motorists Ins. Co., defendants-appellants.
Mills, Timmons & Flowers by David C. Turansky, Shreveport, for plaintiff-appellee.
Before MARVIN, VICTORY and BROWN, JJ.
MARVIN, Chief Judge.
K & B, Inc., a retail drug and variety merchant, appeals a $7,700 judgment for personal injury damages in favor of Mardra Edwards, challenging the trial court's findings that a jewelry box fell from a display shelf onto Ms. Edwards' foot in a Shreveport K & B drugstore, and that K & B was either strictly liable or negligent for failing to properly fasten the shelf to its backing.
K & B disputes the occurrence of the accident, asserting the absence of a corroborating witness. K & B says that even if the accident happened as the trial court found, the court improperly equated proof of an accident with proof of liability, ignoring the other elements of proof required of a plaintiff in a falling merchandise case. K & B argues that strict liability does not apply here and contends it rebutted any prima facie showing of negligence by evidence of its safety inspection procedures. K & B also contends the trial court should have assessed some fault to Ms. Edwards.
Complaining also of the award, K & B contends Ms. Edwards' foot pain and swelling was caused by gout, a metabolic disease, and not by any trauma to her foot. K & B also questions the trial court's allowance of expert testimony by a chiropractor about a foot injury. Answering the appeal, Ms. Edwards seeks to increase the $6,000 general damage award.
In all respects, we affirm.

FACTS
Ms. Edwards shopped for Christmas gifts in the K & B store on Youree Drive in Shreveport on the evening of December 13, 1990. Her grown daughter, Lillian Edwards, accompanied her. Lillian looked at magazines while Ms. Edwards shopped. Both observed that store personnel were restocking the shelves with merchandise.
The shelves in the store are metal. Each shelf measures about three feet in length and is fastened to the vertical shelf backing by three metal teeth on the back of each side of the shelf. The teeth are inserted into slots appropriately spaced in the vertical support holding the shelves.
Ms. Edwards entered the gift aisle, which contained a display of jewelry boxes. Seeing a jewelry box that she desired to examine more closely, she reached over some stock boxes on the aisle floor for the jewelry box, which was on the top shelf of the display, about five feet high, roughly at eye level for Ms. Edwards. She testified that when she touched the jewelry box, the right side of the shelf "fell down from the back," dropping a few inches lower than the left side, and caused the entire jewelry box display to slide to the right side of the shelf. Some of the jewelry boxes fell to the floor. The left side of the shelf remained affixed to the vertical support.
Ms. Edwards testified that the pointed corner of a large wooden jewelry box fell on her right foot, between her big toe and her second toe. She was wearing sandals at the time.
Seeing no one in the aisle, Ms. Edwards sought the store manager on duty, Betsy Hale, who was elsewhere in the store. Ms. Edwards reported that her foot had been injured by a jewelry box that fell from a "loose" shelf. Ms. Hale accompanied Ms. Edwards back to the jewelry box display area. Their respective accounts of what happened after the two reached the jewelry box *1043 display differed, presenting a credibility call for the trier of fact.
According to Ms. Edwards, the jewelry boxes that had fallen from the shelf were still on the floor. Ms. Hale picked up one or two of them, then looked at the shelf and stated it was "loose" and it "must never have been fastened." Ms. Edwards said Ms. Hale told her she would "check into it" to see who had been stocking the shelves in that area.
Ms. Hale, on the other hand, testified that there were no jewelry boxes on the floor, and the shelf and its contents were intact, with no sign of having been disturbed. According to Ms. Hale's testimony, "Everything looked normal." Ms. Edwards could not identify for Ms. Hale which jewelry box had fallen on her foot. Ms. Hale found no dents, chips or scratches in any of the displayed jewelry boxes. She denied having told Ms. Edwards that the shelf had not been properly fastened.
Ms. Hale, however, did prepare an accident report, relating Ms. Edwards' statement to her that a jewelry box had fallen on her right foot. Describing Ms. Edwards' injury, Ms. Hale wrote, "Top of foot sore and big toe red."
Acknowledging she did not see the accident, Lillian Edwards said she heard a loud noise while browsing at the magazine rack. She did not immediately investigate the noise, assuming something had fallen while the store employees were restocking shelves. Casually approaching the gift aisle a little later, Lillian went to where her mother and Ms. Hale were talking. Lillian said she noticed that the shelf was "tilted" and that jewelry boxes were on the floor, a contradiction of Ms. Hale's testimony that the shelf and its contents appeared "normal." Lillian also observed that her mother's foot was swollen and red.
Although no store employees saw the accident, one employee, Virginia Lux, who was stocking shelves a few aisles away from the gift aisle, testified similarly to Lillian that she heard a noise that "sounded like something fell to the floor." A few minutes later, she saw a "woman" customer standing in the gift aisle "looking at some shelves." Ms. Lux was not sure whether the noise she heard came from the direction of the gift aisle and could not say whether Ms. Edwards was the customer she saw standing in the gift aisle.
On December 14, 1990, the day after her visit to K & B, Ms. Edwards sought treatment for her foot, described as being bruised, swollen and painful, from Dr. Elizabeth Savells, a chiropractor who had treated Ms. Edwards before. After eight visits to Dr. Savells over a six-week period, Ms. Edwards was referred by Dr. Savells to a podiatrist. She saw Drs. Piano and Castellano at the Southside Foot Clinic from March 1991 until July 1992. In September 1992 she saw an orthopedic surgeon, Dr. Lewis Jones, who gave her an injection of steroids to reduce the swelling in her foot. Ms. Edwards was still having problems with her foot at the time of trial in June 1993.
In reasons for judgment, the trial court stated:
This case involve[s] a claim by Plaintiff that a shelf fell or shifted and a jewelry box fell on her at the K & B [store] ... The Defendant questioned whether the accident happened, but the evidence consisting of the testimony of both Plaintiff and her daughter together with evidence of injury and lack of eye witnesses on the part of Defendant convinced the Court that this accident did occur.
... [T]he Court finds ... K & B ... and [its] liability insurer liable to Plaintiff. Certainly under a theory of strict liability the apparently defective shelf posed an unreasonable risk of danger to Plaintiff, and if not unreasonably dangerous, some negligence in fastening the shelf or placement of the jewelry box occurred.

LIABILITY ISSUES
Occurrence of Accident
In finding that the accident occurred as Ms. Edwards contended, the trial court exercised its prerogative to weigh conflicting testimony and to assess the credibility of the respective witnesses. Unless the record demonstrates clear error in these respects, we are not at liberty to second-guess the trial court's factual finding. Rosell v. ESCO, 549 *1044 So.2d 840 (La.1989); Stobart v. State through DOTD, 617 So.2d 880 (La.1993). We perceive no such error on this record.
Strict Liability v. Negligence
We agree with K & B that it cannot be held strictly liable for Ms. Edwards' injury since the alleged unreasonably dangerous condition, the loose shelving, is a defect on rather than in K & B's premises. The sole basis for liability in these circumstances is negligence. See and compare Tobin v. Wal-Mart Stores, Inc., 575 So.2d 946 (La.App.2d Cir.1991), writ denied; and Waters v. McDaniel Recreation Center, 521 So.2d 788 (La.App.2d Cir.1988), writ denied.
We note, however, that the appeal is from the judgment, not the reasons for judgment. Whitacre v. Halo Optical Products, Inc., 501 So.2d 994 (La.App.2d Cir.1987). If the evidence in this record supports the judgment under negligence principles, without regard to strict liability, the judgment must be affirmed, notwithstanding that the trial court superfluously mentioned strict liability in its reasons for judgment.

Plaintiff's Burden of Proof
K & B contends the trial court improperly equated proof of an accident with proof of liability, without requiring Ms. Edwards to carry her burden of proof under LRS 9:2800.6. Pertinent to our discussion are the emphasized subsections A and B of the statute:
A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to danger.
B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, and in addition to all other elements of his cause of action, that:
(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable;
(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence; and
(3) The merchant failed to exercise reasonable care.
K & B argues Ms. Edwards was required to prove the elements listed in Subsection B, particularly that K & B either created or had actual or constructive notice of any unreasonably dangerous condition found to have existed in or on its premises. Ms. Edwards contends that Subsection B applies only when a person falls, not when merchandise falls on a person. She maintains she was only required to prove that K & B breached the general duty of a merchant, stated in Subsection A and in the case law.
Subsection B, as it now reads, was enacted by Acts 1990, No. 1025, effective September 1, 1990, a few months before this accident. The prior language of Subsection B specified the burden of proof of the respective parties in suits for damages suffered "as the result of a hazardous condition while on the merchant's premises," whether by a fall or otherwise. Subsection A has not been amended since its enactment in 1988.
The law applied to a falling merchandise claim has generally been similar but not always identical to the law that has been applied in a slip and fall case. This court explained the difference between the plaintiff's burden of proof in these respective cases in Bell v. Bestyet Discount Foods, 372 So.2d 781, 784 (La.App.2d Cir.1979), a falling merchandise case:
In slip and fall cases, the plaintiff can usually establish a premise hazard by merely establishing the existence of foreign material on the floor. In falling merchandise cases, however, evidence establishing only that the merchandise fell is not sufficient to establish a premise hazard. In falling merchandise cases a plaintiff ordinarily *1045 will be required to rely on circumstantial evidence to prove the pre-existing hazard or dangerous condition, but where such evidence preponderates in favor of a finding of a premise hazard, then the burden shifts to the defendant to exculpate itself from fault by showing it exercised reasonable care through appropriate cleanup and inspection procedures or otherwise....
The inference that a premise hazard existed because the plaintiff fell on a foreign substance was consistently drawn in slip and fall cases, culminating in McCardie v. Wal-Mart Stores, Inc., 511 So.2d 1134 (La.1987). In 1988, the legislature enacted § 2800.6, stating that "a person who has suffered damages as the result of a hazardous condition while on the merchant's premises ... must prove that the accident was caused by a hazardous condition." Subsection B, Acts 1988, No. 714.
The 1990 amendment of Subsection B, which applies to claims for injury sustained "because of a fall due to a condition existing in or on a merchant's premises," retains the requirement that the plaintiff must prove the existence of a premise hazard. Acts 1990, No. 1025. The statute, as enacted in 1988 and as amended in 1990, eliminated the inference or presumption of negligence that formerly arose from proof of floor debris in slip and fall cases. Perez v. Wal-Mart Stores, Inc., 608 So.2d 1006 (La.1992).
This inference, however, was never applied in falling merchandise cases. The plaintiff, who alleged injury from falling merchandise, has always been required to prove that a hazardous condition existed in or on the merchant's premises. Bell, supra.
In our view, § 2800.6 B, as amended in 1990, did not change the law applicable to falling merchandise claims. These claims continue to be governed by the principles stated in § 2800.6 A and in Bell, supra. The merchant must use reasonable care to keep his aisles, passageways and floors in a reasonably safe condition, free of hazards which may cause injury. § 2800.6 A. A plaintiff who is injured by falling merchandise must prove that a premise hazard existed, and may do so by circumstantial evidence. Once the plaintiff proves a prima facie premise hazard, the defendant has the burden to exculpate itself from fault by showing that it used reasonable care to avoid such hazards by means such as periodic cleanup and inspection procedures. Bell, supra, 372 So.2d at 784; Tobin v. Wal-Mart Stores, Inc., supra; Courville v. Piggly Wiggly Bunkie Co., 614 So.2d 1366 (La.App.3d Cir.1993).
Retif v. Doe, 93-1104 (La.App. 4th Cir. 2/11/94), 632 So.2d 405 should be compared. There the appellate court found that the trial court erred in applying the burden of proof requirements of § 2800.6 B, as amended in 1990, to a claim on behalf of a child who was injured in a K-Mart store when a shopping cart fell on him. The appellate court applied the duty-risk analysis generally applicable to tort claims, as broadly stated in § 2800.6 A, rather than the more stringent burden of proof applicable to § 2800.6 B claims for injury "because of a fall due to a condition existing in or on a merchant's premises," noting that the child was injured by the falling shopping cart and did not himself fall.

Proof of Negligence
The trial court heard conflicting evidence about the condition of the shelf. According to Ms. Edwards, the shelf became unbalanced and tilted to the right when she reached for a jewelry box that was displayed on the shelf to examine it before deciding whether to buy it. There is no indication in the record that she touched the jewelry box forcefully or in such a way that her actions would have caused a properly fastened shelf to come loose. Ms. Edwards did not recall whether the shelf was leaning before she reached for the jewelry box, but said, "If it had been leaning enough, I would have noticed it."
Ms. Edwards' daughter Lillian testified that the shelf was "tilted" and jewelry boxes were on the floor when she first approached the gift aisle after the accident. Ms. Hale, on the other hand, arrived at the gift aisle before Lillian arrived and after Ms. Edwards reported the accident to Ms. Hale. Ms. Hale said the shelf was in its normal flat position, holding merchandise, and did not appear to be "out of alignment." She denied Ms. Edwards' *1046 testimony that she acknowledged the shelf was "loose" after learning of the accident.
Ms. Hale explained that she was "personally responsible" for the gift aisle. Her duties included ordering merchandise for that aisle on Tuesdays, restocking the shelves with new merchandise on Thursdays, and keeping the aisle neat.
This accident happened on Thursday, a regular stock day. Ms. Hale testified she "would put up the stock when it came in," but did not describe in detail when or how she restocked the shelves on the day of the accident. Ms. Hale said she probably "walked" the gift aisle that day, on one of her many trips through the store to perform her managerial duties. She did not see any "potential hazards" on the aisle that day, saying she "would have noticed if a shelf was tilting." Ms. Hale was not aware of any past problems with, or recent repositioning of, the shelves on the gift aisle.
Ms. Hale described K & B's safety inspection procedures:
We have a slip and fall policy that we walk the store every 30 minutes looking up and down the aisles to see if something may have fallen off the shelf, a ball maybe or something from the toy aisle, something like that.
This procedure for inspecting the aisle floors was followed on the date of the accident. K & B offered no evidence, however, of any inspections, in conjunction with restocking the shelves or otherwise, to assess the structural integrity and safety of the shelves holding the merchandise.
The trial court obviously believed the testimony of Ms. Edwards over that of Ms. Hale in finding that the shelf was not properly fastened to its backing when Ms. Edwards reached for the jewelry box, and in concluding that a premise hazard existed. We cannot say these findings are clearly wrong. Rosell, Stobart, cited supra.
K & B's procedures for inspection of aisle floors for safety hazards, however frequent and reasonable, do not address hazards that may arise in the condition of the store's shelves. On this record, K & B was properly held liable for its negligence in failing to take reasonable steps to avoid the hazard that caused injury to Ms. Edwards. See and compare Bell, Tobin and Courville, all cited supra.
Comparative Fault
K & B contends Ms. Edwards caused or contributed to her own injury by reaching over stock boxes on the aisle floor to "grab" a jewelry box on the top shelf after noticing that the shelf was tilting. K & B argues that Ms. Edwards "may have been pulling on the exact item which fell and injured her." The trial court obviously rejected K & B's argument because of the absence of circumstances that would allow such a factual finding or inference.
We cannot infer or conclude that Ms. Edwards was reaching for a displayed item of merchandise in an abnormal manner, or that she was grabbing or pulling on the jewelry box. The trial court accepted or implied that Ms. Edwards simply sought to pick up and examine the merchandise she was considering buying, an entirely reasonable action for a customer to take. Ms. Edwards did not recall noticing any irregularity in the shelf before she reached for the jewelry box. There is no factual basis in this record for assessing any fault to Ms. Edwards. Compare evidence about a customer's conduct in removing bottles or cans from grocery store displays in Patty v. Brookshire Grocery Co., 389 So.2d 421 (La.App. 2d Cir.1980) and Jackson v. Fireman's Fund Ins. Co., 436 So.2d 698 (La.App. 3d Cir.1983), writ denied.

GENERAL DAMAGES
The trial court awarded Ms. Edwards special damages (about $1,700) and $6,000 in general damages, based on evidence that she received treatment for foot problems from a chiropractor, two podiatrists and an orthopedic surgeon for two years after the accident. Ms. Edwards had pain and swelling in her right foot throughout that time, and was diagnosed with numerous foot ailments, including a ganglionic cyst, tenosynovitis, a toenail growing atop another, bunions, corns, callouses and gout. The trial court heard expert testimony that the first three conditions were probably caused by the jewelry *1047 box fall, while the others were unrelated to the accident.
K & B contends all of Ms. Edwards' foot pain and swelling was caused either by gout, a metabolic disease which is generally not induced by trauma, according to the experts, or by her wearing of improper shoes and failing to follow her doctors' instructions to stay off her feet. K & B also contends the trial court should not have heard evidence about Ms. Edwards' foot condition from the chiropractor, Dr. Savells, because LRS 37:2801 limits a chiropractor's scope of practice to diagnosing and treating "conditions associated with the functional integrity of the spine," and Dr. Savells' treatment of Ms. Edwards' foot was outside the field of chiropractic expertise.

Chiropractor's Testimony
Dr. Savells acknowledged that Ms. Edwards' foot injury, objectively manifested by a bruise between her right first and second toes and swelling in the same area, did not affect her spine. Dr. Savells did not treat Ms. Edwards' spine, but did administer physical therapy treatments (methods or modalities), primarily ultrasound, to her foot. Ultrasound is said to help reduce swelling and increase blood circulation to injured tissue. Dr. Savells opined that Ms. Edwards' injury was caused by trauma suffered within 48 hours of Ms. Edwards' first visit to her, which was the day after the K & B incident, and not by wearing tight shoes or by Ms. Edwards' age (60 at the time of the accident).
While not licensed as a physical therapist, Dr. Savells is licensed in Louisiana as a chiropractor and has taken, as part of her chiropractic training, 120 hours of classroom study in the field of physical therapy. Dr. Savells explained the interplay between chiropractic care and physical therapy in her training and in her practice, saying she uses the therapy "a lot" in her chiropractic practice:
Q. In other words, one of the requirements to be licensed in business as a chiropractor who can also administer physical therapy is to complete a course of 120 hours of instruction in physical therapy?
A. Right. Right. It's an extracurricular class that we take so we are licensed to use physical therapy in our office.
Q. Okay. Now, the Louisiana licensing agency, once it licenses you to practice chiropractic, you can also practice physical therapy as an adjunct to that; is that right?
A. Right. In Louisiana you can.
Q. That's what the law is, in terms of licensing chiropractic physicians.
A. Right.
Q. So it's not unusual for a chiropractor to use modalities involved in physical therapy along with other methods of chiropractic treatment.
A. Right. Correct.
Q. Is it a common practice in chiropractic to treat individuals who have injured extremities?
A. Right.... That's not unusual. I do it a lot.... Tendonitis, bursitis, knee pain, swollen ankles, you know, in an injury, ultrasound is one of the best things to use when you have a sprain or strain.
Dr. Savells' testimony regarding the scope of her practice as a Louisiana-licensed chiropractor was not impeached or disputed by other expert testimony.
While LRS 37:2818 prohibits a Louisiana-licensed chiropractor from being "considered a licensed physical therapist as defined by statute," (our emphasis), the use of physical therapy modalities to treat a foot injury that does not involve the spine is neither expressly included in nor expressly excluded from the statutory delineation of a chiropractor's scope of practice under § 2801.
The trial court accepted Dr. Savells as an expert witness "in the area of chiropractic care to encompass the field of physical therapy... [w]ithout deciding a chiropractor's general competence to treat foot injuries..." Dr. Savells did not hold herself out as a licensed physical therapist, nor was she tendered or accepted as such in the trial court. Considering her specialized training, knowledge and experience in using physical therapy modalities to treat injured extremities as part of her chiropractic practice, we cannot say, on this record, that the trial *1048 court abused its discretion in accepting her as an expert in chiropractic care, encompassing physical therapy. See LCE Art. 702; State v. Stringer, 567 So.2d 758 (La.App. 2d Cir.1990). See also and compare Carvell v. Winn, 154 So.2d 788 (La.App. 3d Cir.1963), writ denied.
Treatment History
Ms. Edwards first saw Dr. Savells on December 14, 1990, the day after the K & B incident. She reported having had a jewelry box fall on her right foot, between her first and second toes. That area of her foot was found bruised, swollen and tender to the touch.
When Ms. Edwards last saw Dr. Savells on January 23, 1991, some six weeks after the accident, the bruise on her foot had healed and the swelling had been reduced but not eliminated by the ultrasound treatments. A few weeks earlier, Ms. Edwards had told Dr. Savells that her pain and swelling increased "after standing for a period of time," indicating that she had not followed Dr. Savells' advice to stay off her feet as much as possible. Having no other treatment options to offer, Dr. Savells recommended that Ms. Edwards see a podiatrist.
From March 1991 through July 1992, Ms. Edwards made nine visits to the Southside Foot Clinic. The doctor who saw her on her first two visits, Dr. Piano, left the clinic before he was deposed. He did not testify at trial. Dr. Castellano, who treated Ms. Edwards for the remainder of her clinic visits, testified about Dr. Piano's treatment and diagnosis from the notes written by Dr. Piano in the clinic's medical records. This testimony was allowed for the limited purpose of showing the information on which Dr. Castellano relied to express his opinions about Ms. Edwards' condition, and not to show the truth of the information recorded by Dr. Piano.
According to the medical records, Ms. Edwards' right first toe was swollen, painful, red and warm to the touch when she first saw Dr. Piano on March 13, 1991. She reported that her foot had been "injured in December with the condition subsiding but then it got much worse recently with swelling and pain." Dr. Piano performed several diagnostic tests, including one for gout, a disease caused by excessive uric acid production and often manifested by the symptoms Ms. Edwards exhibited. Dr. Piano "ruled out" gout after receiving the uric acid test results a week later. Dr. Castellano opined, however, that the March 1991 uric acid reading was "at the high end of the `within normal limits' range." Had he been treating Ms. Edwards at that point, Dr. Castellano would have ordered another uric acid test before making a definitive diagnosis.
Dr. Piano's diagnosis of Ms. Edwards' condition on March 22, 1991, was "probable ganglionic cyst" between her first and second toes. Dr. Castellano explained that a ganglionic cyst is a fluid-filled sac which develops when the covering of a tendon is broken by some type of force, such as a blow to the foot, or the wearing of shoes that are too tight. Depending on its size and location, the cyst may put pressure on surrounding nerves. Ganglionic cysts are difficult to treat and often recur, even after they are surgically removed. Dr. Castellano opined that the development of a ganglionic cyst between Ms. Edwards' first and second toes, as diagnosed by Dr. Piano in March 1991, was consistent with her having had a jewelry box fall on that area of her foot some three months earlier.
Dr. Castellano began treating Ms. Edwards on October 3, 1991, her next visit to the clinic after Dr. Piano left the clinic. Her complaints to Dr. Castellano included tenderness and swelling in the area between her first and second toes, and a double toenail growing on her first toe. Dr. Castellano avulsed the partial nail, which he said could have been related to the jewelry box fall. He attributed the pain and swelling between her toes to tenosynovitis, or inflammation of the tendons and joint coverings with synovial fluid. This, too, in his opinion, was consistent with the jewelry box fall.
Ms. Edwards returned to Dr. Castellano with complaints of pain and swelling on November 21, 1991 and January 22, 1992. On the latter visit, Dr. Castellano suspected that Ms. Edwards may have a ganglionic cyst, in addition to the persistent tenosynovitis. He *1049 prescribed electrotherapy to help reduce the swelling and to "dry up" the ganglionic cyst.
Ms. Edwards underwent electrotherapy at the clinic on January 23, January 30 and February 6, 1992. She also received a steroid injection to reduce the swelling on January 30. She still had pain and swelling, however, on February 6, when Dr. Castellano noted that the cyst had gotten larger and was perhaps compressing a nerve. Dr. Castellano told Ms. Edwards that the cyst could be surgically removed but informed her of the high rate of recurrence, even after surgery. Ms. Edwards elected not to undergo surgery.
About five months later, on July 2, 1992, Ms. Edwards returned to Dr. Castellano with severe pain and swelling in her big toe, which was warm to the touch. Diagnostic tests confirmed Dr. Castellano's suspicion of gout, for which he prescribed medication and diet modification to lower her level of uric acid. On July 21, Ms. Edwards reported by phone that her condition had improved. Dr. Castellano asked her to see him again in 30 days, but she did not return to the clinic.
On September 24, 1992, Ms. Edwards saw an orthopedic surgeon, Dr. Lewis Jones, complaining of pain and swelling between her first and second toes. She told Dr. Jones that "something had fallen on her right foot." Dr. Jones suspected that she may have a traumatic neuroma, or a pinched nerve, which he said could have been related to the jewelry box fall. Dr. Jones gave Ms. Edwards an injection of steroids. When he saw her again about two weeks later, on October 9, 1992, her foot was not swollen or painful and appeared normal. This caused Dr. Jones to question whether she really had a neuroma, because one steroid injection usually provides only short-term relief to patients with neuromas. Dr. Jones advised Ms. Edwards to return as needed. She had not see him again by the time of trial in June 1993.
Dr. Jones noted a bunion and several corns and callouses on Ms. Edwards' right foot. These, he said, are normally caused by wearing tight shoes and were not causally related to the accident.
Dr. Jones did not suspect gout from the condition of Ms. Edwards' foot on September 24, 1992, almost three months after Dr. Castellano diagnosed gout on July 2. The doctors explained that gout may or may not recur after an acute episode. Dr. Castellano opined that a traumatic injury may trigger a recurrence of gout in a patient who has had gout before, but said, "I don't believe trauma will create gout" in a patient without a history of it. There is no evidence in this record that Ms. Edwards had gout before this accident.

Cause of Foot Problems
Based on Dr. Castellano's testimony that gout is generally not caused by trauma, K & B argues that all of Ms. Edwards' foot problems were caused by gout and therefore were unrelated to the accident. The trial court did not accept this argument, noting Dr. Castellano's testimony that Ms. Edwards had either or both a ganglionic cyst and tenosynovitis, both of which can be caused by trauma, in addition to one documented acute episode of gout.
Alternatively, K & B argues that all of Ms. Edwards' complaints were caused by her wearing of poorly fitting shoes and her failure to heed her doctors' advice to stay off her feet. The record, however, supports the trial court's contrary conclusion, notwithstanding that Ms. Edwards did have a bunion, corns and callouses which Dr. Jones attributed to her wearing of tight shoes.
Dr. Castellano testified that poorly fitting shoes or excessive weight-bearing may aggravate a ganglionic cyst in certain areas of the foot, such as the Achilles tendon, but opined that a cyst in the area between the first and second toes, such as Ms. Edwards', would not be similarly affected. Dr. Castellano said he did not tell Ms. Edwards to stay off her feet, as Dr. Savells had told her earlier. Dr. Castellano did not notice what type of shoes Ms. Edwards wore to the clinic, and thus could not say whether she wore "improper" shoes.
On this record, the trial court was not clearly wrong in finding that some of Ms. Edwards' foot problems were caused by the accident (ganglionic cyst, tenosynovitis, double toenail), while other problems were not (gout, bunion, corns, callouses).

*1050 General Damage Award
Ms. Edwards testified that she was still having intermittent pain and swelling in her right foot at trial, 2½ years after the accident. She said the pain was not as severe as it was initially, but still sometimes kept her from standing at her job as a schoolteacher and from doing housework, riding a bicycle and playing ball with her grandson. Ms. Edwards said the pain "lingers for a few days," limiting her activities, and then "it gets okay and I just go right on back to my activities." She treats the episodic pain with "home remedies," such as Ben-Gay, heat, epsom salts, and Tylenol.
The trial court awarded Ms. Edwards $6,000 in general damages, taking into account that she did not follow Dr. Savells' orders to stay off her feet and did not return to Dr. Castellano as often as directed. Ms. Edwards seeks an increase in the award, arguing that the record lacks a factual basis for the trial court's conclusion that she failed to mitigate her damages. We cannot agree.
Dr. Savells' testimony that Ms. Edwards did not stay off her feet as directed was based on a notation in her records that Ms. Edwards complained of increased pain and swelling "after standing for a period of time." Dr. Castellano testified that Ms. Edwards did not come in as often as he recommended for electrotherapy, which admittedly would not have cured either the ganglionic cyst or the tenosynovitis, but would have, in Dr. Castellano's view, decreased the pain and swelling that was causing her discomfort.
Considering the totality of the evidence, which we have summarized, we cannot say the trial court's general damage award is abusively low. Reck v. Stevens, 373 So.2d 498 (La.1979).

DECREE
The judgment is affirmed in all respects. Costs of the appeal are assessed to K & B.
AFFIRMED.
VICTORY, J., concurs in result.