IrMARVIN, Chief Judge.
Harold Cotton, a former inmate and trustee in the Shreveport city jail, appeals a judgment dismissing his tort action against the city for mental anguish damages arising out of Cotton assisting jailers in handling the body of an inmate infected with hepatitis who had hanged himself in' his cell. Cotton did not contract the disease but bases his action on his fear, for several months after the incident, that he was exposed to contracting hepatitis.
Cotton alleged that the jailers had “instructed” and “forced” Cotton and another trustee to assist them in handling the body instead of seeking help from the jail’s other paid employees. Cotton claimed the city was vicariously liable for the jailers’ negligence and independently liable for having failed to implement “a proper procedure for removing corpses from the jail cells.”
The trial court found that the city did not breach any duty owed to Cotton by “requesting or directing him to help” the jailers under the emergency circumstances presented, and that Cotton “voluntarily complied with [the] request, [notwithstanding] his understanding that the inmate they were helping was infected with hepatitisOur brackets.
Finding the judgment to be supported by the record, for reasons we assign, we affirm.
FACTS
The suicide victim, Paul Cochran, had been placed in a one-man cell before his death, having been diagnosed with an acute Hepatitis Type A infection and a current or previous Hepatitis B infection when his blood was tested at a local hospital in October 1992, a few months before his death on January 7, 1993. The jailers and the inmates, including Cotton, knew Cochran had been quarantined because he was “rumored” to have “a bad case of hepatitis.’’ The rumor was apparently confirmed only after Cochran’s death.
|2Cochran’s cell was across the hall from the trustee dorm on the second floor of the jail. Dorothy Rothenberger, the jailer supervisor, and another female jailer whose name does not appear in the record were on duty on that floor when Cochran’s body was discovered. A third jailer, James Balzrette, had been assigned to the first floor of the jail.
Cochran used a bed sheet to hang himself from the bars at the top of his cell. Rothen-berger discovered Cochran’s suspended body when she went to his cell to deliver his evening meal. Not knowing whether Cochran was dead or alive, Rothenberger immediately told the female jailer who was near the cell to call for medical help and to send Balzrette up from the first floor of the jail, explaining that Cochran was. “a big guy” and she could not handle him by herself. She then told Cotton and the other trustees who were passing by Cochran’s cell on their way to dinner that she needed their help to hold Cochran’s body up to get the weight off the sheet around his neck while she tried to get him down.
Cotton and another trustee assisted Roth-enberger by holding Cochran’s clothed body around his midsection for several minutes while Rothenberger tried unsuccessfully to cut through the sheet with a dull pocket knife. Balzrette arrived within minutes of being summoned and tried to cut the sheet with his pocket knife while Rothenberger began loosening the knot in the sheet at the back of Cochran’s neck. Once the knot was loosened, Cotton helped the others remove' Cochran’s body from the noose and laid him down on the cell floor shortly before the EMT personnel arrived.
Cotton, Rothenberger and Balzrette were the only trial witnesses. Cotton testified Cochran “had been dead for a while” when his body was discovered, inferring this conclusion from the fact that Cochran’s body was “stiff and excessively heavy.” Cotton had no medical training and did not attempt to take IgCochran’s pulse or to otherwise *653 determine whether Cochran may have still been alive.
Cotton said he did not know whether he came in contact with Cochran’s bodily fluids or with any open wounds or open sores during the few minutes he had physical contact with Cochran’s body. Cotton also did not know or offer any evidence to explain how hepatitis is transmitted from one person to another.
After Cochran’s death and at the city’s expense, Cotton’s blood was tested for hepatitis. The negative test results did not become available to Cotton until the disease’s incubation period of several months had passed. During that time, Cotton feared that he had contracted the disease. He also had recurring thoughts and dreams of seeing Cochran’s stiff body “just hanging there” and of holding the body up so others could “cut him down.” The city provided Cotton with psychological counseling and medication to relive his anxiety and to help him sleep until Cotton was released from jail about two months after the incident. Cotton did not seek any further treatment after his release.
At trial in July 1997, more than four years after Cochran’s death, Cotton testified:
Q. Now how long after the event did you still have problems with this?
A. Well, when I sit down alone, idle time I think about it but not near as strong as I did immediately after it happened.
Q. You realize now that you didn’t catch hepatitis?
A. Yes, I do.
Cotton characterized -Rothenberger’s call for help with Cochran’s body as an order, while the city’s attorney referred to it as a request. Rothenberger testified, “This was an emergency situation and I’m not sure how I said this, you know, but I did let him [Cotton] know that I needed help holding this man up.” Rothenberger directed her call for help to the trustees who were closest to LCochran’s cell, saying, “I didn’t pick and choose [Cotton], he was just accessible.” Our brackets.
Cotton heeded Rothenberger’s call for help without voicing any objection to handling Cochran’s body. Cotton corroborated Roth-enberger’s testimony that she did not threaten him with the loss of his trustee status or any other type of sanction if he refused to help. Cotton said he “agreed to help ... because [he] was instructed to do so.” When asked if he would have volunteered to help had he not been instructed to help, Cotton testified, “I couldn’t answer that.”
Rothenberger testified she did not know for a fact that Cochran had hepatitis but she knew he was rumored to have it. Balzrette gave similar testimony. Neither jailer wore any protective garments such as rubber gloves while handling Cochran’s body. Roth-enberger explained that the situation was “too much of an emergency” for her to obtain protective gear. Balzrette said he “probably” would have been concerned about the possibility of contracting hepatitis “if [he] had stopped to think about it.” He testified, however, that the situation was “life threatening [to Cochran] ... and that’s what they pay us for, not only to lock people up but to protect them while they’re there.” Our emphasis and brackets.
In a post-trial memorandum, Cotton acknowledged that Rothenberger was faced with an emergency when she discovered Cochran’s body hanging in his cell. Claiming such emergencies may be expected to occur in the city jail from time to time, Cotton argued the city was negligent for failing to adopt and train its jailers in procedures to be used in an emergency. Relying only on the portion of Balzrette’s testimony emphasized above [“That’s.what they pay.us for ...”],. without any additional supporting evidence, Cotton asserted that high-risk tasks in |5the jail, even under emergency conditions, should only be assigned to paid jail employees and not to the “prison labor,” the trustee inmates.
TRIAL COURT FINDINGS
The trial court assessed the evidence in light of the city’s general tort duties to provide inmates who work in the jail with safe working conditions and equipment and to protect them from unreasonable risks of foreseeable harm. Bridgewater v. State Through Dept. of Corrections, 434 So.2d 383 *654 (La.1983); Brewington v. La. Dept. of Corrections, 447 So.2d 1184 (La.App. 3d Cir. 1984), writ denied. The court made these findings:
[T]he preponderance of the evidence fails to establish that the City of Shreveport breached any duty owed to Harold Cotton, in either requesting or directing him to help Ms. Rothenberger under the particular facts and circumstances of this case. Further, the actions of the [City’s] employees ... were not negligent;
... Mr. Cotton voluntarily complied with Ms. Rothenberger’s request, regardless of his understanding that the inmate they were helping was infected with hepatitis A and B.
Cotton argues on appeal that the trial court “failed to recognize the distinction between prisoners and non-prisoners with regard to performing known hazardous tasks,” citing Bridgewater, Brewington and other cases recognizing that prison inmates are not in a position to refuse to perform tasks known to be dangerous. Cotton contends Balzrette’s testimony clearly shows that the jail employees, unlike the trustee inmates, “are paid to take the known risks [and] they have the choice to refuse if they so desire.” Arguing that the task he was instructed to perform subjected him to the risk of contracting “a highly infectious and incurable disease,” Cotton claims his amicable compliance with Rothenberger’s instructions to the trustee inmates does not support the trial court’s implicit finding that he voluntarily assumed the risk of contracting the disease.
| (¡While acknowledging that Rothenber-ger’s “sole motivation” was to save Cochran’s life, Cotton contends Rothenberger was “totally unprepared” to handle the emergency with which she was confronted, causing her to issue instructions “out of impulse, rather than prior training.” Emphasizing that Cochran’s disease was the reason for his being separated from the other inmates in the jail, Cotton claims the city’s conduct in “placing [Cotton’s] life at risk in an attempt to rescue ... Cochran,” without having provided the jailers and the trustee inmates with the training and protective gear necessary to safely handle such an emergency, was “a textbook example” of the city’s failure to protect Cotton from an unreasonable risk of foreseeable harm.
DISCUSSION
The trial court essentially found that the damage alleged by Cotton (his fear of contracting hepatitis) was caused solely by Cotton’s having voluntarily complied with Roth-enberger’s request or order to the trustee inmates to help her handle the body of an inmate known to be infected with hepatitis, and not by any substandard conduct on the city’s part. Under the circumstances of this record, we agree with Cotton’s contention that the voluntary nature of his compliance should not have been considered as a factor in the negligence inquiry, now couched in terms of comparative fault rather than assumption of risk. Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988); Griffin v. Foti, 523 So.2d 935 (La.App. 4th Cir.1988), writ denied.
Cotton did not undertake the known risk on his own initiative, as did the prisoners found to have assumed the risk of their injuries under the prior law. See, for example, Parker v. State, 353 So.2d 333 (La.App. 1st Cir.1977), writ denied; and Perro v. State, 517 So.2d 258 (La.App. 1st Cir.1987), writ denied. Cotton simply “did as he was told” to do by a prison official, albeit without objection and ^without any overt threat of sanctions for noncompliance. Compare Bridgewater, supra, 434 So.2d at 384. Whether Rothenberger’s instructions are construed as a request or as an order, Cotton’s compliance with those instructions is consistent with “the reality of prison life, namely, the prisoner’s restriction of freedom and subjection to close supervision and discipline.” Brewington, supra, 447 So.2d at 1192. On this record, we attach no legal significance to the fact that Cotton acted “voluntarily.”
The more pertinent inquiry is whether the trial court erred in finding that Cotton failed to prove the city breached its duty to protect Cotton from unreasonable risks of foreseeable harm. Brewington, supra. As mentioned, the gist of Cotton’s ar *655 gument is that the city failed to provide the jailers and the trustee inmates with the training and protective gear necessary to safely handle Cochran’s body in the emergency circumstances created by the discovery of Cochran’s self-inflicted peril.
Cotton did not introduce any expert testimony to explain how hepatitis is transmitted from one person to another, or to show whether and how Cochran’s body could have been handled differently to reduce the risk of transmission. Compare Brewington, supra; Stilley v. State, 376 So.2d 1007 (La.App. 1st Cir.1979), writ denied; and Leonard v. Blackburn, 468 So.2d 825. (La.App. 1st Cir. 1985), writ denied. Balzrette’s testimony that the jailers are paid to take risks to protect inmates in life-threatening situations does not, of itself, support Cotton’s contention that high-risk tasks in the jail should only be assigned to the paid jail employees, and not to the trustee inmates, even in emergency circumstances.
In a negligence action against the municipal employer of police officers who injured a suspect while attempting to disarm him, the supreme court considered the scope of the officers’ duty to use reasonable care in approaching an |8armed suspect, a potentially dangerous situation which required the officers to make “a quick decision under extremely charged circumstances.” Mathieu v. Imperial Toy Corp., 94-0952, p. 11 (La.11/30/94), 646 So.2d 318, 326. The court concluded that the officers had a duty to choose a course of action which was reasonable under the totality of the circumstances, but expressly declined to hold the officers to a higher standard of “always ehoos[ing] the ‘best,’ or even a ‘better,’ method of approach.” Id. at p. 10, 646 So.2d at 325; our emphasis and brackets. This court applied the same standard of care to a deputy sheriff who allegedly failed to take reasonable steps to protect motorists approaching a mud-covered stretch of highway on a rainy day. Fitzgerald v. Files Timber Co., 29,145 (La. App.2d Cir. 1/22/97), 687 So.2d 674, unit denied.
The evidence in this record clearly supports the trial court’s finding that Rothen-berger acted reasonably under the totality of the circumstances in soliciting help from the other jailers on duty and from the trustee inmates who happened to be walking by Cochran’s cell when Rothenberger discovered Cochran’s suspended body. Being unsure whether Cochran was still alive, and realizing that it would take more than two people to extricate Cochran from the noose, Rothen-berger instructed the female jailer on duty on the second floor to call for medical help and to send Balzrette up from the first floor of the jail. While awaiting his arrival, Roth-enberger solicited help from the trustee inmates who were nearest to Cochran’s cell, which was located across the hall from the trustee dorm. There is no evidence in the record showing or suggesting that jailers other than the three mentioned were on duty at the time, or that any other paid jail employees were as readily available to assist Rothenberger in trying to save Cochran’s life as were the trustee inmates.
| gCotton essentially contends the emergency situation could have been handled in a safer manner had the city properly trained and equipped the jail employees and the trustee inmates. He did not, however, offer any evidence to affirmatively establish that the manner in which Cochran’s body was handled was unsafe or unreasonable from a medical standpoint, or to show what could or should have been done differently to reduce any assumed risk of infection to those who handled the body. There is also no evidence from witnesses with experience in prison management to support Cotton’s argument that it is patently unreasonable to assign high-risk tasks to trustee inmates under any circumstances, emergency or otherwise.
CONCLUSION
Notwithstanding our agreement with Cotton’s contention that the “voluntariness” of his conduct should not have been considered, we find ample support in the record for the trial court’s conclusions that the jailers acted reasonably under the totality of the circumstances and that the city was not shown to have been independently negligent. Compare Mathieu, supra; Fitzgerald, supra; Reed v. State Dept. of Corrections, 351 So.2d 788 (La.App. 1st Cir.1977). Disposition of *656 the appeal is determined by the correctness of the trial court’s judgment, not the reasons for judgment. Edwards v. K & B, Inc., 26,002 (La.App.2d Cir. 8/17/94), 641 So.2d 1040.
DECREE
At Cotton’s cost, the judgment is AFFIRMED.