766 So.2d 705 (2000)
James T. KENDRICK, et al., Plaintiffs-Appellees,
v.
The LOUISIANA AND NORTH WEST RAILROAD COMPANY, et al., Defendants-Appellants.
No. 33,810-CA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 2000.
*707 Wilkinson, Carmody & Gilliam by Arthur R. Carmody, Jr., Shreveport, Counsel for Appellants, The Louisiana and North West Railroad Company, Zack Kidd and California Union Insurance Company.
Weems, Schimpf, Hayter, Gilsoul & Carmouche (APLC) by Carey T. Schimpf, Kenneth P. Haines, Shreveport, William D. Hall, P.L.C., Counsel for Appellant, James T. Kendrick.
Mayer, Smith & Roberts by David F. Butterfield, Shreveport, Counsel for Economy Fire & Casualty Company, Intervenor/Defendant in Reconvention/Appellee, and James T. Kendrick in his Capacity as Defendant in Reconvention/Appellee.
Cook, Yancey, King & Galloway by John T. Kalmbach, Shreveport, Counsel for Aetna Casualty & Surety Company, Intervenor/Appellee.
Before NORRIS, C.J., and PEATROSS & DREW, JJ.
PEATROSS, J.
This appeal arises out of an automobile/train accident which occurred at a railroad crossing in rural Claiborne Parish. Plaintiff James T. Kendrick[1] was driving a pickup truck, towing a goose neck trailer with a backhoe on it as he approached the crossing. He was unable to clear the tracks in time to avoid his trailer being struck by a Louisiana and Northwest Railroad Company ("LNW") train. Mr. Kendrick allegedly sustained minor physical injuries and his truck, trailer and backhoe were damaged. Mr. Kendrick sued LNW and its general liability carrier, California Union Insurance Company. Economy Fire & Casualty Company ("Economy"), insurer of the trailer, and Aetna Casualty & Surety Company ("Aetna"), insurer of the backhoe, intervened for amounts paid to Mr. Kendrick for damage to the equipment. LNW filed a petition in reconvention against Mr. Kendrick and Economy for damages sustained to the train's engine.
After a bench trial, the trial court found that Mr. Kendrick was 75 percent at fault for the accident and LNW was 25 percent at fault. It awarded Mr. Kendrick $2,415.48 in property losses; $206.56 for medical bills; loss of income in the amount of $9,972; and $2,000 in general damages/pain and suffering; all reduced by 75 percent. The trial court also awarded the insurers of the pickup and equipment $15,179.64, representing $5,707 to Economy and $9,410.37 to Aetna, each reduced by 75 percent. LNW was awarded $3,972.64 for damage to the train engine, reduced by 25 percent.
Defendants LNW; Zack Kidd, the train engineer; and California Union Insurance Company, the liability carrier for LNW (collectively referred to herein as "LNW"); appeal, challenging the trial court's findings of liability and allocation of fault. Mr. Kendrick has answered the appeal, contesting the allocation of fault on his part and asserting the additional assignment that the damage award was insufficient and should be raised by this court. Aetna and Economy also answered the appeal, both asserting that LNW was 100 percent at fault. Essentially, all parties challenge the apportionment of fault; and, additionally, LNW alternatively objects to the award of loss of business profits, and Mr. Kendrick seeks an increase in the damage *708 award. Since we find that the accident was caused solely by the fault of Mr. Kendrick, we reverse the portion of the judgment allocating 25 percent of the fault to LNW and the awards to Economy and Aetna; amend the damage award to LNW and the taxing of expert witness fees accordingly; and, as amended, affirm that part of the judgment in favor of LNW.

FACTS AND ACTION OF THE TRIAL COURT

The Accident
The collision occurred at 3:30 p.m. on January 4, 1989, at the intersection of the LNW shortline running between McNeal, Arkansas, and Gibsland, Louisiana, and the Standpipe Road near Homer, Louisiana. The intersection is commonly known as the "Camp Crossing."[2] Mr. Kendrick was driving east on Standpipe Road in his Ford F350 pickup truck, towing a goose neck trailer on which a John Deere backhoe was mounted. Mr. Kendrick testified that, as he approached the Camp Crossing, his windows were down and the radio in his truck did not work. He stated that he slowed his truck to approximately 30-35 miles per hour and looked both left and right to see if a train was approaching, but did not see one. He further testified that he listened for a train's horn, but did not hear anything. According to his testimony, Mr. Kendrick was within 50 feet of the tracks when he saw the train approaching from the north. He locked his brakes, but was unable to stop short of the tracks. His truck stopped on top of the tracks and he pressed the accelerator in time to move the truck, but not the trailer, out of the train's path. The train struck the trailer, causing substantial damage to it and the backhoe. Mr. Kendrick admitted that he was going too fast to stop in time for the train and that he was familiar with the Camp Crossing and traversed it frequently.
The LNW train, which consisted of 3 engines and 19 cars, was traveling southbound at approximately 22 miles per hour according to Zack Kidd, the train's engineer.[3] The speed limit on that track is 25 miles per hour. Mr. Kidd testified that he first saw Mr. Kendrick's truck when the engine was approximately 100 feet from the crossing. Mr. Kidd immediately applied the train's emergency brakes, but was unable to avoid the collision. Mr. Kidd also testified that he has run that route for years and that he began blowing the whistle approximately one quarter of a mile from the crossing; the whistle sequence was two long blows followed by one short blow and ended with one extra-long blow.[4] Mr. Kidd further testified that he *709 was in the middle of the final extra-long blow when he saw Mr. Kendrick's truck. Ralph Whitlock, the train's fireman, and J.T. Lyles, a conductor, who were both in the engine with Mr. Kidd, also testified that Mr. Kidd sounded the train's whistle appropriately. A second conductor, C.W. Lyles, who was on the rear of the train, corroborated this testimony.
Danny Lee, a deputy sheriff with the Claiborne Parish Sheriffs Department, went to the scene of the accident and reported that the accident was the fault of Mr. Kendrick for failure to yield the right-of-way to the train. He measured 42 feet of skid marks from the left tires of Mr. Kendrick's truck and only 12 feet of skid marks from the right tires. According to Deputy Lee, this indicates that the brakes were not working properly, or that the right side brake was not working. Mr. Kidd corroborated this testimony by stating that, when he first saw Mr. Kendrick's truck, the back left tire was sliding and emitting smoke.
According to the testimony of Deputy Lee, no one appeared to be injured immediately after the accident. Mr. Kendrick got out of his truck, Mr. Kidd and the train crew got off of the engine and Deputy Lee questioned them regarding any injuries. All of the men replied that they were not injured.
Deputy Lee testified that he found no evidence of anything that the train crew failed to do which may have contributed to the collision. As previously stated, based on his questioning of Mr. Kendrick at the scene of the collision, Deputy Lee determined that Mr. Kendrick had failed to yield the right-of-way to the approaching train and was, therefore, solely at fault for the accident.[5]
Two other witnesses, Mark Hammon and Debbie Locke, friends of Mr. Kendrick, were outside a mobile home approximately two-tenths of a mile from the accident site when the collision occurred. Although they could not see the crossing, they testified that they did not hear the train's whistle until immediately before the collision. Both Mr. Hammon and Ms. Locke testified that they heard a short whistle immediately followed by a crash. The parties stipulated that two additional witnesses, Tracy Hammon and Jimmie Locke, would have corroborated that testimony.[6]
Howard Malpass was accepted by the trial court as an expert in the field of accident investigation and testified on behalf of Mr. Kendrick. Mr. Malpass designed a graphic illustration of the crossing depicting the dynamics of the accident based on his investigation.[7] Additionally, utilizing a computer data program based, in part, on Department of Commerce publications, to calculate Mr. Kendrick's stopping distance, Mr. Malpass concluded that Mr. Kendrick's truck, traveling at 30 miles per hour, would have required a stopping distance of 110 to 112 feet.[8] Mr. Malpass *710 further opined that Mr. Kendrick was unable to stop in time for the train because he was unable to see it due to the existence of vegetation in the northwest quadrant of the crossing.
Donald Phillips of Crawford and Company, an independent accident investigation firm hired by LNW, testified on behalf of the railroad. Mr. Phillips took photographs of the crossing on January 6, 1989, two days after the accident, which were admitted into evidence. According to Mr. Phillips, and one of his photographs, an approaching motorist could see more than 400 feet up the tracks to the north from a point between 40 and 50 feet west of the crossing. A second photograph taken by Mr. Phillips shows the unobstructed view of an approaching motorist at approximately 160 feet from the crossing.
Dr. William Fogarty, an expert in accident investigation and reconstruction and highway rail grade crossing construction and design, also testified on behalf of LNW. Dr. Fogarty calculated Mr. Kendrick's required stopping distance utilizing an equation based on the coefficient of friction, which does not consider the weight of the vehicle or driver reaction time. Dr. Fogarty opined that, traveling at 30 miles per hour, the stopping distance of Mr. Kendrick's truck and trailer would have been 38 feet.[9] Since only 38 feet were required for Mr. Kendrick to stop, Dr. Fogarty opined that the accident was caused solely by Mr. Kendrick's inattentiveness to the approaching train. According to Dr. Fogarty, when Mr. Kendrick was approximately 160 feet from the crossing, the train, traveling 23 miles per hour, would have been coming into view. This opinion was based, in part, on the photograph taken by Mr. Phillips of the view to the north up the tracks at 160 feet back. In Dr. Fogarty's opinion, had Mr. Kendrick been looking in the direction of the approaching train at that time, he would have had sufficient time to stop his truck and trailer no closer than 15 feet from the nearest rail. Dr. Fogarty also stated, however, that his calculation would not be correct if the truck was overloaded or if the brakes were defective. Finally, at a distance of approximately 32 feet from the rail, Dr. Fogarty opined that a motorist approaching from the west (traveling east) would have an unobstructed view of the track to the north (the motorist's left) of over 600 feet.[10]

The Camp Crossing
As its sole basis for finding LNW 25 percent at fault for the accident, the trial court stated that the railroad did not "evenly" *711 maintain the crossing.[11] The trial court was referring to high vegetation which allegedly existed at the time of the accident in the northwest quadrant of the crossing. In the trial court's opinion, the vegetation presented an obstruction of view to the north (obstructing the view of an oncoming southbound train) for motorists traveling east on Standpipe Road, the direction in which Mr. Kendrick was traveling.
Deputy Lee testified that he has worked accidents for 25 years and has no knowledge of any other accidents at this crossing. He further testified that there are no obstructions of view within the statutory stopping area of 15 to 50 feet. This testimony was corroborated by that of Gladney Dillon, Vice President and General Manager of LNW, who verified the lack of any prior accidents and further testified that he has never received a complaint about the condition of the crossing from a governmental agency or individual. Mr. Dillon also testified that, at 55 feet from the crossing, a motorist can see the switch stand target which is 435 feet up the tracks to the north. Finally, according to Dr. Fogarty's and Mr. Phillip's testimony, as described above, any vegetative growth would not have posed a sight restriction to Mr. Kendrick.

Opinion of the Trial Court
Mr. Kendrick was awarded $2,000 in general damages, $206.56 for medical bills and $2,415.48 in property losses. The primary dispute in this case, however, concerns the trial court's award of $9,972 for loss of business profits for the period of time during which Mr. Kendrick's equipment was not available for work. At trial, Mr. Kendrick presented the testimony of six witnesses, each of whom testified regarding jobs that Mr. Kendrick may have done during that time period following the accident had his equipment not been out of service (the testimony of these witnesses is discussed in detail infra). The total gross profit from these six jobs was $9,972. The trial court stated in its reasons for judgment that, since the testimony of the six potential employers of Mr. Kendrick was not controverted, the court "finds that they have been proven" and awarded the full amount of each lost job. All the awards to Mr. Kendrick were reduced by 75 percent in accordance with the trial court's assessment of fault. Finally, as previously stated, the trial court awarded to the various insurers the amounts expended to repair the trailer and backhoe, reduced by 75 percent, and to LNW, the amount necessary to repair the damage to the train's engine, reduced by 25 percent.

DISCUSSION

Liability
Initially, we agree with the trial court's finding that Mr. Kendrick was liable for the accident. In general, a motorist has a duty to maintain reasonable and proper control of his/her vehicle at all times. The duties of motorists approaching railroad crossings are set forth in La. R.S. 32:171 and 175. Section 171 provides, in pertinent part:
§ 171. Obedience to signal indicating approach to train
A. Whenever any person driving a motor vehicle approaches a railroad grade crossing under any of the circumstances stated in this Section, the driver of such vehicle shall stop within fifty feet but not less than fifteen feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:
* * *
(3) A railroad train approaching within approximately nine hundred feet of the highway crossing emits a signal in accordance with

*712 R.S. 32:168, and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard.
(4) An approaching railroad train is plainly visible and is in hazardous proximity to such crossing.
* * *
E. At any railroad grade crossing provided with railroad cross buck signs, without automatic, electric, or mechanical signal devices, crossing gates, or a human flagman giving a signal of the approach or passage of a train, the driver of a vehicle shall in obedience to the railroad cross buck sign, yield the right-of-way and slow down to a speed reasonable for the existing conditions and shall stop, if required for safety, at a clearly marked stopped line or, if no line, within fifty feet but not less than fifteen feet from the nearest rail of the railroad and shall not proceed until he or she can do so safely. If a driver is involved in a collision at a railroad crossing or interferes with the movement of a train after driving past the railroad cross buck sign, the collision or interference is prima facie evidence of the driver's failure to yield the right of way.
La. R.S. 32:175 provides, in pertinent part:
§ 175. Vehicles must yield at railroad grade crossings; exceptions
A. The driver or operator of a vehicle approaching a rail-highway grade crossing identified by the presence of a railroad cross buck sign shall slow down to a speed reasonable for the existing conditions, or shall stop if necessary, before entering the cross walk on the near side of the intersection or, in the event there is no cross walk, at a clearly marked stop line, or if none, then at the point nearest the intersecting rail of such railroad where the driver or operator has a clear view of any approaching train. The driver or operator shall listen and look in both directions along such track for any approaching train and for signals indicating the approach of a train. Having slowed or stopped in this manner, the driver or operator shall yield the right of way to any approaching train and then shall proceed only upon exercising due care and upon being sure that it is safe to proceed.
* * *
C. The provisions of this Section do not relieve drivers or operators of the responsibility to comply with the provisions of R.S. 32:171 and 32:173.
The jurisprudence is replete with cases establishing that a motorist approaching a railroad crossing has a heightened duty of care. The motorist must use his/her senses of sight and hearing for possible approaching trains. LeJeune v. Union Pacific R.R., 97-1843 (La.4/14/98), 712 So.2d 491; Rivere v. Union Pacific R. Co., 93-1132 (La.App. 1st Cir.10/7/94), 647 So.2d 1140, writ denied, 95-0292 (La.3/24/95), 651 So.2d 295. A motorist is presumed to have heard and seen what he/she "could have heard and seen." Rivere, supra.
The law does not require motorists to stop at every railroad crossing, but a driver cannot expect to drive with impunity through a railroad crossing where his view is obstructed; instead, motorists must keep their vehicles under such control as to be able to stop immediately upon spotting an oncoming train. Rivere, supra. Furthermore, if a motorist's view is obstructed as he approaches a railroad crossing, he must exercise an even higher degree of caution. LeJeune, supra.
In our opinion, based on the record before us, it is clear that Mr. Kendrick was negligent. He admitted in his testimony that he was traveling too fast to stop the heavy rig he was driving in time to avoid the collision. Based on his investigation at the scene of the accident, Deputy Lee noted on his report that the cause of the accident was Mr. Kendrick's failure to yield the right-of-way to the train. Furthermore, *713 we note that Dr. Fogarty testified that Mr. Kendrick's inattentiveness caused this accident. Finally, Mr. Kendrick was extremely familiar with the crossing, having just traversed it earlier that morning. He simply did not see or hear what he should have,[12] nor did he keep his truck under such control as to enable him to comply with the mandate of La. R.S. 32:171.
More troubling is the trial court's finding that LNW was also negligent. In negligence cases, we use a duty-risk analysis to determine whether liability exists under the facts of a particular case. Under this analysis, a plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by the duty breached. LeJeune, supra; Syrie v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173; Berry v. State, Through DHHR, 93-2748 (La.5/23/94), 637 So.2d 412; Mundy v. Department of Health & Human Resources, 620 So.2d 811 (La.1993). Under the duty-risk analysis, all four inquiries must be affirmatively answered for plaintiff to recover. Mathieu v. Imperial Toy Corp., 94-0952 (La.11/30/94), 646 So.2d 318.
We begin by examining the duty owed by the railroad and its employees to Mr. Kendrick. The train crew's duty is determined in light of the duty imposed on motorists regarding railroad crossings as described above. LeJeune, supra. Our supreme court, in LeJeune, supra, explained the train crew's duties as follows:
The statutory duties imposed on the railroad and its employees regarding railroad grade crossings ... are twofold. La. R.S. 32:169 requires the railroad to erect cross buck signs not more than fifty feet nor less than fifteen feet from crossings. Moreover, La. R.S. 32:168 imposes an affirmative duty on the train crew to blow the train's horn continuously from at least 300 yards out until the train reaches the crossing. A corresponding duty is placed on motorists by La. R.S. 32:171 to stop whenever a train within 900 feet of a crossing blows its horn and poses an immediate hazard because of its speed or proximity to the crossing.
It is well established in our jurisprudence that a train crew can presume that vehicles approaching railroad crossings will obey the law and stop in time to avoid an accident. The train need not slow down at all or attempt to stop upon seeing a vehicle approaching an upcoming crossing. It is only if a crew member notices that "the driver of the approaching car is oblivious of the oncoming train or for some other reason does not intend to stop" that the train crew becomes responsible for immediately doing everything in its power to avert the collision. In other words, "the train crew can assume drivers will bring their vehicles to a stop ... unless the vehicle's approach is so unusual as to place an ordinarily prudent man on notice the vehicle cannot be brought to a stop in time to avoid a collision." Thus, the train crew's duty was to do everything in its power to stop the train once a crew member could no longer reasonably believe that LeJeune would be able to stop the ambulance and that a collision was imminent. (Internal citations omitted.)
Our next inquiry is whether the train crew breached any of the above duties. First, as previously stated, it is undisputed that the crossing was marked with the required cross buck sign. Second, the trial court specifically found that the train crew sounded the train's whistle in accordance with the law. The trial court was presented with differing views of the evidence and made a credibility determination based on the testimony of the *714 train crew, Mr. Kendrick, Mr. Hammon and Ms. Locke. Based on this testimony, the trial court concluded that there was no evidence to show that the railroad employees lacked credibility. We can find nothing in the record to suggest that the trial court's conclusion was manifestly erroneous or clearly wrong. The parties devote a considerable amount of argument to the cases relied upon by the trial court in accepting the train crew's testimony regarding the sounding of the whistle over the testimony of the "whistle witnesses," Mr. Hammon and Ms. Locke. See Lagrange v. Missouri Pacific R. Co., 503 So.2d 1158 (La.App. 3d Cir.1987) and Burk v. Illinois Central Gulf R. Co., 529 So.2d 515 (La.App. 1st Cir.1988), writ denied, 532 So.2d 179 (La.1988). Those cases hold that positive testimony that the whistle was sounded is superior to negative testimony that there was no whistle sounded at all.[13] Since we find ample support in the record for the trial court's conclusion that the train properly sounded the whistle, we need not engage in a lengthy discussion of this issue. Moreover, the task of the reviewing court is to review the judgment of the trial court and not the reasons for judgment. Cotton v. City of Shreveport, 30,734 (La.App.2d Cir.6/24/98), 715 So.2d 651; Edwards v. K & B, Inc., 26,002 (La. App.2d Cir.8/17/94), 641 So.2d 1040. Third, Mr. Kidd testified that, as soon as he saw Mr. Kendrick's truck, he applied the train's emergency brakes, which is the only action he could have taken to attempt to avoid the collision. At that point, however, the train was unable to stop in time to avoid the collision. The other members of the train crew corroborated Mr. Kidd's testimony regarding the application of the emergency brakes. We find, therefore, that Mr. Kidd did everything in his power to avert the collision.
In addition to the above statutory duties, Louisiana has long applied the jurisprudentially created rule known as the "dangerous trap" doctrine in determining whether a particular crossing presents an unreasonable risk of harm to the motoring public. Fry v. Southern Pacific Transp. Co., 30,540 (La.App.2d Cir.6/24/98), 715 So.2d 632, writ denied, 98-1986 (La.10/30/98), 727 So.2d 1170, writ denied, 98-2033 (La.10/30/98), 728 So.2d 387. A railroad crossing is considered a "dangerous trap" when it is unusually dangerous because the view of the motorist is so obstructed as to force him into a position of peril, dangerously near the tracks, before he has a view of the oncoming train. Moore v. Kansas City Southern Railroad Co., 31,080, 31,081 (La.App.2d Cir.10/28/98), 722 So.2d 296, writ denied, 98-2943 (La.1/29/99), 736 So.2d 832; Fry, supra; Rivere, supra. If a crossing is determined to be unreasonably dangerous, the railroad company will be held liable unless it can show that it took unusual precautions, such as reducing the speed of the train or increasing its warning devices. Fry, supra. Of course, the lack of an unreasonably dangerous condition implies the absence of a duty on the part of a defendant. Id., citing Townsend v. Westinghouse Elevator Corp., 25,966 (La. App.2d Cir.8/17/94), 641 So.2d 1022, writ denied, 94-2371 (La.11/29/94), 646 So.2d 403. Furthermore, the mere happening of an accident does not engender a presumption that defects are present. Spott v. Otis Elevator, 601 So.2d 1355 (La.1992); Fry, supra; Townsend, supra.
Our courts have consistently refused to apply the dangerous trap doctrine *715 where a motorist has an unobstructed view of the tracks at a point which would not place the motorist in a dangerous or perilous position. See Fry, supra; Rivere, supra. In Burk, supra, the first circuit declined to apply the doctrine where the evidence established that the motorist had a clear view of the tracks from a point which would not place the motorist in a perilous position and the motorist was familiar with the crossing.[14] Moreover, the court in Burk held that the fact that a motorist has to slow a vehicle to obtain a clear view does not render a crossing a dangerous trap. In the later case of Rivere, supra, the trial court found the Missouri Pacific Railroad Company liable in two respects, failure to blow the horn (assigning 50 percent fault to the railroad) and inadequate sight distance (assigning 20 percent fault to the railroad). The first circuit reversed the allocation of fault as to inadequate sight distance. Specifically, the court held:
According to Louisiana law MOPAC has the duty to erect and maintain a "Railroad Cross Buck" sign at the crossing. LSA-R.S. 32:169. The railroad also has the duty to maintain its right-of-way adjacent to the railroad tracks. It is uncontroverted that the cross buck sign was in place at the Laurel Ridge Road crossing at the time of this accident and that the railroad's 50 foot right-of-way was clear.
Any other duties of the railroad with regard to further safety devices rises in proportion to the increasing dangerousness of the crossing, as determined by an approaching vehicle's ability to see the oncoming train. This concept is referred to as the "dangerous trap" doctrine. A crossing is considered a "dangerous trap" when it is unusually dangerous because the view of the motorist is so obstructed as to require that he place himself in a position of peril dangerously near the tracks, before he has a view of the oncoming train. When a dangerous trap exists, the railroad company will be held liable, unless it can show that it took unusual precautions, such as reducing the speed of the train, or increasing its warning or providing signaling devices, etc. Glisson v. Missouri Pacific Railroad Company, 158 So.2d 875 (La. App. 3rd Cir.1963). As discussed more fully below, the Laurel Ridge Road crossing was not a "dangerous trap" because Bart Rivere did not have to place himself in a position of peril to view the tracks and because he was familiar with the crossing. Accordingly, we believe that the trial court erred in assessing any percentage of fault to MOPAC for the inadequate sight distance.
Since Rivere had an unobstructed view up the tracks at 50 feet back, the court declined to find liability based on alleged inadequate sight distance. Partial obscurement may exist at a railroad crossing, in which case the duty is placed on the motorist to place himself in a position where he has a clear view of any approaching train. Holland v. Norton, 70 F.Supp.2d 666 (E.D.La.1999) citing LeJeune, supra.
In the case sub judice, Mr. Kendrick asserts that Camp Crossing was unreasonably dangerous due to obstructions of view in the form of trees and other vegetation. The trial court in this case did not find that this crossing constituted a dangerous trap to the motoring public or to Mr. Kendrick. Rather, the trial court simply found that an obstruction of view existed which contributed to this accident, with no discussion of the doctrine whatsoever. After reviewing the entire record, *716 we do not find sufficient evidence in the record to support the conclusion that this crossing was a dangerous trap.
We are mindful that our review is governed by the manifest error/clearly wrong standard, under which we may only reverse the trial court's findings of fact if we find that no reasonable factual bases for the findings exist and that the findings are clearly wrong or manifestly erroneous. The manifest error standard, true enough, leaves reasonable evaluations of credibility and reasonable inferences of fact to the discretion of the trial judge. When those determinations are clearly wrong, however, this court is called upon to reverse. La. Const. Art. 5 § 10; Alexander v. Pellerin Marble & Granite, 93-1698 (La.1/14/94), 630 So.2d 706; State in Interest of Vinson v. Smith, 29,464 (La.App. 2d Cir.6/18/97), 697 So.2d 628. The instant case plainly falls into the latter category.
The most compelling evidence that Mr. Kendrick had an unobstructed view at a point which did not place him in a perilous position is the photograph taken by Mr. Phillips just two days after the accident which depicts the view of a motorist at 40 to 50 feet west of the crossing, looking to the north. The switch stand marker, which the record reveals is more than 400 feet up the track to the north, is clearly visible from the photographer's/motorist's vantage point of 40 to 50 feet. From this evidence alone, it is clear that Mr. Kendrick would have had an unobstructed view up the tracks to the north at 40 to 50 feet from the crossing.
Additionally, the testimony of Dr. Fogarty, Mr. Phillips and Deputy Lee supports this conclusion. First, Dr. Fogarty, referring to a photograph taken by Mr. Phillips from approximately 160 feet west of the crossing, opined that, when Mr. Kendrick was 160 feet from the crossing, the train would have been coming into view from the north. Dr. Fogarty also agreed that Mr. Kendrick would definitely have had an unobstructed view up the tracks at 55 feet back. Mr. Phillip's testimony corroborated Dr. Fogarty's testimony in that regard. Further, Deputy Lee stated that he found no obstructions of view of a southbound train for an eastbound motorist. Mr. Kendrick argues that this testimony should be disregarded because Deputy Lee made his observations while standing in the middle of the tracks. During cross-examination by Mr. Kendrick's counsel, however, Deputy Lee testified as follows:
Counsel: Okay. On your accident report when you noted that there was no obstructions of view, were you referring to any particular area near the railroad crossing?
Deputy Lee: Sir, when you pull up to the track and stop and look both ways, there's no obstruction.
Counsel: Okay. How close to the track is it when you say you pull up to the track and look both ways?
Deputy Lee: Well, from fifty to fifteen feet, you know, as the law states, you can see it. You can see where there's no obstructions.
Additionally, Deputy Lee testified that he had no knowledge of anyone ever reporting that this crossing was a problem or hazard or posed some unusual risk. Mr. Dillon corroborated this testimony. Finally, we note that once Mr. Kendrick applied his brakes, his actual stopping distance was 42 feet, as evidenced by the skid marks created by his left tires. From this, we can deduce that Mr. Kendrick saw the approaching train at least 42 feet from the crossing; and, if two seconds of reaction time is factored in, it follows that Mr. Kendrick saw the train even farther back than 42 feet. As such, we conclude that Mr. Kendrick could have placed himself in a position where he had a clear view of an oncoming train and would have had sufficient time to stop had he slowed his vehicle to an appropriate speed in approaching this crossing. His failure to do so was negligent.
*717 It is also significant that Mr. Kendrick was extremely familiar with this crossing, having traversed it on numerous occasions in the past and, most significantly, earlier on the morning of the accident. He testified that he was aware that this track was a mainline for LNW. Additionally, as previously mentioned, there is no evidence of any previous accidents at the crossing. Finally, we note that there was no evidence of any other hazardous condition at the crossing or condition of the crossing surface itself.
Regarding the trial court's reasoning on the issue of LNW's liability, we note the somewhat conflicting basis for the trial court's conclusion regarding LNW's failure to maintain the crossing. Despite specifically accepting the testimony of Deputy Lee regarding the lack of obstructions of view present at the time of the accident, the trial court, nonetheless, concluded to the contrary, that the vegetation had not been "evenly" maintained by LNW. We find the trial court's conclusion to be clearly wrong in this regard. As previously stated, Mr. Kendrick had an unobstructed view from 50 feet back, which encompasses the railroad's 50 foot right-of-way. On this record, we find no negligence on the part of the train crew; rather, we consider the sole cause of the accident to be the negligence of Mr. Kendrick.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is reversed with respect to the finding of liability on the part of Defendants LNW, Zack M. Kidd and California Union Insurance Company. Accordingly, those portions of the judgment in favor of Intervenors Economy Fire & Casualty and Aetna Casualty & Surety Company and against Defendants LNW, Zack M. Kidd and California Union Insurance Company are also reversed. That part of the judgment awarding LNW, as Plaintiff in Reconvention, damages for the cost of repair to the train engine is amended to delete the 25 percent reduction of that award, thereby allowing LNW to recover 100 percent of that award from Economy Fire & Casualty and Mr. Kendrick, as Defendants in Reconvention. Finally, that portion of the judgment regarding expert witness fees is hereby amended to reflect that 100 percent of such fees are to be borne by Mr. Kendrick.
Costs are taxed to Plaintiff, James T. Kendrick.
REVERSED IN PART, AMENDED IN PART AND, AS AMENDED, AFFIRMED.
NOTES
[1] Mr. Kendrick's former wife, Catherine, was originally a party to the suit claiming loss of consortium. The parties divorced, however, and she withdrew from the suit.
[2] At the time of the accident, there were two sets of tracks which ran north and south; Standpipe Road runs east and west.
[3] Mr. Kidd testified that the train's speed was 22 miles per hour at the time he saw Mr. Kendrick's truck. The trial court concluded that, based on the time that the train departed from Ethel, Arkansas, an intervening stop; the time of the collision; and the distance between the two; the train was traveling at an average speed of 26 miles per hour. The trial court did not make a finding as to the actual speed of the train at the time of the accident and such was not a basis for the trial court's assessment of fault to LNW. Although the parties disagree in their briefs as to the actual speed the train was traveling, we do not believe it to be a significant issue on appeal.
[4] At the time of the accident, La. R.S. 32:168, which sets forth the law in Louisiana regarding the sounding of a train's whistle, provided, in pertinent part:

Every railroad company or person owning and operating a railroad in this state shall equip each locomotive engine with a bell and a whistle or horn which, under normal conditions, can be heard at a distance of three hundred yards and, upon engines approaching at grade any street or highway crossing, whether or not said crossing shall be otherwise protected, shall, for a distance of not less than three hundred yards and until the crossing is reached, cause either the bell to be sounded continuously or blasts of the whistle or horn to be sounded in the manner provided by the Uniform Code of Railroad Operating Rules....
[5] Deputy Lee admitted during his testimony that he did not issue a citation to Mr. Kendrick for failure to yield the right-of-way; however, Deputy Lee indicated that he believed he would have been justified in doing so.
[6] The Hammons and Lockes were gathered socially that afternoon and there is some indication in the record that these four witnesses may have been drinking and were not actively listening for an approaching train.
[7] Mr. Malpass visited the accident site approximately one year after the collision. At that time, he took photographs and measurements which he used in designing his graphic illustration and in reaching his conclusions about the cause of this accident. Mr. Malpass testified that it was his understanding that the photographs he took of the crossing accurately reflected the condition of the crossing at the time of the accident. His testimony also reflects, however, that the northwest quadrant had been "maintained" at the time of his visit to the site and that, since he "was not there at the time of the incident," his conclusions reflect only the conditions at "the time that I was there."
[8] According to Mr. Malpass, the computer program utilizes the style or make of the vehicle, gross vehicle weight and speed to determine the vehicle's stopping distance. The report generated is referred to as a "Vehicle Speed and Stopping Distance Calculator." The program does not, however, factor in such variables as the addition of the goose neck trailer or added weight of the backhoe loaded thereon. In other words, the gross vehicle weight takes into account only the weight of the pickup truck, not the additional weight of the trailer and its load. Mr. Malpass noted that adding the trailer and its load to the equation would result in an increased stopping distance.
[9] The trial court, in its reasons for judgment, added two seconds to the stopping time to allow for driver reaction time, which added 87.6 feet to the stopping distance. Adding the increase in stopping distance due to driver reaction time to the actual distance it took for Mr. Kendrick's vehicle to stop, 42 feet, yields a total stopping distance of 129.6 feet. Based on this calculation, it is reasonable to believe that Mr. Kendrick first saw the approaching train when he was at least 129.6 from the crossing.
[10] Dr. Fogarty based his conclusions on photographs taken the day after the accident, the accident report prepared by Deputy Lee, the Crawford Report (the investigative report generated by Donald Phillips) and two visits to the site. Dr. Fogarty visited the site once several years prior to trial and, again, on the morning of trial, which is when he took measurements, conducted skid testing and calculated the coefficient of friction for purposes of determining Mr. Kendrick's stopping distance. He testified that his observations of brush, trees and vegetation on the morning of trial were consistent with the photographs taken the day following the accident.
[11] The crossing was marked with a standard crossbuck sign and an advanced warning sign. The adequacy of the markings was not an issue at trial, nor is it an issue on appeal.
[12] The issue of whether Mr. Kidd sounded the train's whistle properly is discussed infra.
[13] We note that, as to the admissibility of negative testimony regarding the custom or habit of a railroad not to sound the whistle at a particular crossing, the third circuit has held these cases to be superceded by La. C.E. art. 406. See Corbello v. Southern Pacific Transportation Co., 586 So.2d 1383 (La.App. 3d Cir.1991), writ denied, 589 So.2d 1052 (La.1991). The case sub judice does not involve the admissibility of negative evidence regarding the custom of LNW with regard to sounding the whistle, but, instead, concerns the discretion of the trier of fact in weighing differing testimony regarding the sounding of the whistle on the day of the accident.
[14] In Burk, the plaintiff argued that trees, high grass and an abandoned store created an obstruction of view. The evidence, however, revealed that, at 25 feet from the tracks the motorist could see 540-590 feet; at 50 feet from the tracks the motorist could see 400 feet; at 75 feet from the tracks the motorist could see 335 feet; and at 100 feet from the tracks the motorist could see 180 feet.