MARION F. EDWARDS, Judge.
1 ¡.Plaintiff, Joanne Elkins, appeals from a trial court ruling that granted Summary Judgment in favor of defendant in this railroad crossing case. For the following reasons, the judgment of the trial court is reversed.
FACTS AND PROCEDURAL HISTORY
This case centers around an accident that took place on July 22, 1999 near Lul-ing, Louisiana. On that date, plaintiff, JoAnne Elkins (“Elkins”), was in the process of crossing a set of railroad tracks by U.S. Highway 90, when preceding traffic at the red light forced her to remain on the railroad tracks, where her car was subsequently struck by a train owned by defendant, Union Pacific Railroad Compa *1189 ny. The tracks are owned by Burlington Northern and Santa Fe Railway Company (“BNSF”). As a result of the accident, Elkins suffered head injuries and reportedly sustained amnesia as well.
Elkins filed suit against BNSF and others in the Twenty-Ninth Judicial District Court for the Parish of St. Charles. On July 8, 2004, BNSF filed a Motion for Summary Judgment, alleging that that sole cause of the accident at issue was the fact that Elkins was stopped on the railroad tracks in violation of LSA-R.S. 32:171(B). After a hearing on October 18, 2004, the trial court granted BNSF’s | ¡¡Motion For Summary Judgment on November 2, 2004 and dismissed Elkins’ suit with prejudice. Elkins timely filed the present appeal.
LAW AND ANALYSIS
On appeal, Elkins raises five assignments of error: (1) The trial court erred in granting Summary Judgment when there were genuine issues of material fact regarding whether Elkins was “stopped” on the tracks, or was “trapped” on the tracks; (2) The trial court erred in its interpretation of LSA-R.S. 32:171(B) by interpreting it as an absolute bar to recovery by any Louisiana motorist who is struck by a train, regardless of whether warning devices were activated prior to the plaintiffs actual crossing of the track and lowering of the gates; (3) The trial court erred in finding that plaintiff had intentionally stopped her car on the railroad tracks; (4) The trial court erred in finding that even properly activated crossing gates, bells, whistles, and horns, all mandated to be activated at specific times under Louisiana law, may not have prevented this accident, and that testimony regarding their failure to do so was, therefore, irrelevant; and (5) The trial court erred in failing to consider whether BNSF was negligent in failing to coordinate the timing and activation of its warning devices at the railroad crossing itself with the traffic light immediately beyond the railroad crossing at the intersection of Barton and U.S. Highway 90 to ensure that the traffic would not back up at that intersection onto the train tracks when a train was approaching, thus creating a dangerous trap.
Appellate courts review summary judgments de novo under the same criteria that govern the district court’s consideration of whether summary judgment is appropriate.[1] An appellate court must ask the same questions as does the trial court in determining whether summary judgment is appropriate: whether there is a Lgenuine issue of material fact remaining to be decided, and whether the appellant is entitled to judgment as a matter of law.[2] The appellate court must consider whether the summary judgment is appropriate under the circumstances of the case.[3] There must be a “genuine” or “triable” issue on which reasonable persons could disagree.[4] Under the amended version of LSA-C.C.P. art. 966, the burden of proof remains on the mover to show “that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law.” A material fact is one that *1190 would matter on the trial of the merits.[5]
In contesting BNSF’s Motion, Elkins raised what it contended to be 11 contested issues of fact surrounding the accident: (1) How many vehicles were between the red light and the railroad tracks at the time of the accident; (2) Was plaintiff able to ascertain how many vehicles would be between her and the tracks at the time of the accident; (3) How many vehicles can fit safely between the red light and the tracks without causing an accident; (4) Did the warning devices activate before or after Elkins had crossed the tracks; (5) How much time elapsed between the activation of bells and lights and impact; (6) How much time elapsed between the lowering of the crossing gates and impact; (7) Was there any room for Elkins to move forward or to the side or in any direction to clear the tracks in light of the traffic backed up in front of her and the crossing gates lowered in back of her; (8) Did BNSF have in place a warning device which timed the activation of the bells, flashing lights and crossing gates with the traffic signal immediately adjacent to the railroad crossing to prevent a motorist from becoming trapped on the railroad tracks; (9) Was Elkins trapped on the railroad tracks due to traffic Isbacked up at the traffic light and the crossing gates lowered directly in back of her; (10) Did the train operator blow its horn prior to Elkins crossing the tracks, or did he blow the horn after El-kins crossed the tracks and had to stop because of traffic; and (11) Was Elkins given any warning whatsoever of an approaching train prior to her becoming trapped on the tracks?
In granting BNSF’s Motion for Summary Judgment, the trial court stated its Reasons For Judgment:
After considering the matter from all sides presented, the Court has to arrive at the same conclusion advanced by defendant-mover: regardless of whether the active warning devices were activated before or after Ms. Elkins was on the track, and regardless of the length of time the active warning devices were emitting warning between activation and impact, the fact still remains that Ms. Elkins was on the tracks in violation of the law.
La. R.S. 32:171(B) states simply and succinctly that “(n)o person shall stop a motor vehicle upon any railroad crossing.”
The evidence adduced shows that Ms. Elkins did just what was proscribed by the statute — she stopped her vehicle on the rail-road crossing. Because of that fact, no amount of bells, whistles, horns, lights, or cross bars would have prevented the accident.
The evidence adduced convinces this Court that there is no genuine issue of fact as to the cause-in-faet of the accident. The accident was caused by Ms. Elkins having stopped on the tracks in violation of law. The Court can find no liability for the accident on the part of the mover.
(Emphasis added.)
In the first paragraph of the trial court’s Reasons For Judgment, the trial court found that the issue of whether or not the warning devices were timely activated is irrelevant. We disagree. Louisiana courts have previously held that warning device failure at a railroad crossing, if proven, is a basis for liability. Additionally, LSA-R.S. 32:168 requires that “any person controlling the motion of an engine *1191 on any railroad shall commence sounding the audible signal when such |fiengine is approaching and not less than one quarter of a mile from the place where such railroad crosses any highway.”
The record shows that the train’s driver, Fred Deloach, said in his statement that he saw Elkins’ vehicle stopped on the north side of Barton Avenue when he started blowing his horn. Deloach stated that Elkins’ vehicle then proceeded to cross and the stop on the tracks-. The record also demonstrates, however, that several witnesses to the accident contend that Elkins did not cross the tracks at the time the warning lights were flashing, nor did the train timely sound its horn to give warning of its approach. Robert Sirmon testified in his deposition that when he heard the warning bells of the train, El-kins was already on the tracks. Clement Smith stated that, when he heard a train horn and looked back, he noticed that there was a car on the tracks. Garret Candles testified that he saw Elkins’ vehicle approach the crossing and begin to cross when the cross bars were not yet down. After the car was stuck on the tracks, Candles said he heard the train sound its horn as it approached.
BNSF contends that its inspection records prove that the crossing gates were in working order at the time of the accident. The crossing was tested at 8:30 p.m. on July 22, 1999, approximately one hour after the collision. BNSF further contends that its regular inspection record from the previous year also shows that the warnings were properly maintained and inspected.
The record contains two documents, however, entitled “Signal Trouble Ticket Report.” The first report, dated May 9, 1999, made by “citizen Debbie Badoux” states that the gates did not come down when the train passed. The report states that, after a test, the gates were found to be working properly. A second report dated May 18, 1999 shows that the same gates were stuck in the down position. Elkins contends that these reports demonstrate that this crossing has had previous problems. Elkins further argues that eyewitnesses at the time of the 17accident create an issue of material fact as to whether the gates functioned properly by not lowering timely prior to the train’s approach.
Based on a review of the record, we first find that genuine issues of material facts exists as to whether: (1) The warning devices were operating properly at the time of the accident; and (2) Whether the train operator complied with LSA-R.S. 32:168 in timely warning motorists of his oncoming approach.
Even were we to find, however, that that the trial court was correct in finding that the proper functioning of the warning signals is irrelevant, there still exists an issue as to what duties Elkins had as a motorist crossing the railroad tracks and whether Elkins did, in fact, violate those same duties. In the case of Wilkerson v. Kansas City S. Ry.,[6] the court noted:
A motorist approaching a railroad crossing has a heightened duty of care. The motorist must use her senses of sight and hearing for possible approaching trains. LeJeune v. Union Pacific R.R., 97-1843 (La.4/14/98), 712 So.2d 491; Rivere v. Union Pacific R. Co., 93-1132 (La.App. 1st Cir.10/7/94), 647 So.2d 1140, writ denied, 95-0292 (La.3/24/95), 651 So.2d 295. A motorist is presumed to have heard and seen what she “could have heard and seen.” Kendrick [v. Louisiana and North West R. Co., 766 So.2d 705 (2000)], supra. The law does not *1192 require motorists to stop at every railroad crossing, but a driver cannot expect to drive with impunity through a railroad crossing where her view is obstructed; instead, a motorist must keep her vehicle under such control as to be able to stop immediately upon spotting an oncoming train. Furthermore, if a motorist’s view is obstructed as she approaches a railroad crossing, she must exercise an even higher degree of caution. Kendrick, supra.
(Emphasis added.)
LSA-R.S. 32:175 provides, in pertinent part:
A. The driver or operator of a vehicle approaching a rail-highway grade crossing identified by the presence of a railroad cross buck sign shall slow down to a speed reasonable for the existing conditions, or shall stop if necessary, before entering the cross walk on the near side of the intersection or, in the event there is no cross walk, at a clearly marked stop line, or if none, then at the point nearest the intersecting rail of such railroad where the driver or operator has a clear view of any [ ^approaching train. The driver or operator shall listen and look in both directions along such track for any approaching train and for signals indicating the approach of a train. Having slowed or stopped in this manner, the driver or operator shall yield the right of way to any approaching train and then shall proceed only upon exercising due care and upon being sure that it is safe to proceed.
(Emphasis added.)
In the present case, the record contains a photograph of the accident scene. From the perspective of the photograph, the safety gates in front of the tracks are visible, as is the red light on the other side of the tracks near U.S. Highway 90. To the left of the photograph is an open expanse that disappears into a stand of trees on either side of the tracks. It would appear from this photograph that a motorist would be able to see a train approaching at a close distance.
Although Elkins has no recollection of the accident or the event leading up to it, on appeal she argues that a genuine issue of material facts exists as to whether a train was visible at the time she crossed the tracks. Specifically, she refers to testimony of one driver on Barton Road who crossed the tracks immediately before she did, and another driver who was behind her, neither of whom saw a warning signal or an approaching train.
Evidence in the record shows the following: Josette Sirmon, who was stopped at the light on the other side of the tracks at the time of the accident, testified in a deposition that, at the time she crossed the tracks, there was “no evidence of a train approaching.” Susan Godson, who was behind Elkins at the time of the accident, gave a taped interview the day after the accident. Godson said that she didn’t notice that a train was coming until she heard bells, and the crossing guards came down. She said that it seemed to her that as soon as the bars went down the train was there.
In contrast, Ricky Thompson stated that “when crossing the R/R tracks at Barton Avenue and Highway 90, there was a train coming and I had enough room |9to cross over.” In a recorded interview, Thompson said that he could see the train at some distance.
Based on the foregoing, it would appear that a genuine issue of material fact exists as to whether Elkins violated her duty of vigilance at a railroad crossing.
In its Reasons For Judgment, the trial court stated that it based its ruling solely *1193 upon Elkins’ violation of LSA-R.S. 32:171(B), which provides that “No person shall stop a motor vehicle upon any railroad crossing.” Elkins argues, however, the trial court erred in granting Summary Judgment when there were genuine issues of material fact regarding whether Elkins was “stopped” on the tracks, or was “trapped” on the tracks.
BNSF argues that the law does not provide for a distinction. Louisiana courts have recognized, however, that certain railroad crossings or “dangerous traps” exist, which pose a danger to the public and which become the liability of the railroad companies that own them. As discussed by the court in Kendrick v. Louisiana and North West R.R. Co.:[7]
Louisiana has long applied the juris-prudentially created rule known as the “dangerous trap” doctrine in determining whether a particular crossing presents an unreasonable risk of harm to the motoring public. Fry v. Southern Pacific Transp. Co., 30,540 (La.App.2d Cir.6/24/98), 715 So.2d 632, writ denied, 98-1986 (La.10/30/98), 727 So.2d 1170, writ denied, 98-2033 (La.10/30/98), 728 So.2d 387.... If a crossing is determined to be unreasonably dangerous, the railroad company will be held liable unless it can show that it took unusual precautions, such as reducing the speed of the train or increasing its warning devices. Fry, supra ....
Our courts have consistently refused to apply the dangerous trap doctrine where a motorist has an unobstructed view of the tracks at a point which would not place the motorist in a dangerous or perilous position. ...
(Emphasis added.)
|inReading the record as a whole, it would appear that a genuine issue of material fact exists as to whether this particular railroad crossing presented a “dangerous trap” on the day that the plaintiff was struck by the train. There is strong evidence to suggest that plaintiff may have been trapped on the tracks against her will. There is also evidence that this exact situation has happened to other motorists. For example, in the present case, one other witness, Robert Sirmon, testified that he himself was once trapped on the same tracks in a situation similar to the one faced by plaintiff. Sirmon testified that, because of traffic ahead of him, he was trapped after warning devices indicated that an oncoming train was coming. He said that he managed to avoid being hit by pulling into an adjacent ditch.
SUMMARY
In summary, the trial court based its judgment solely on a literal reading of LSA-R.S. 32:171(B), which provides that “No person shall stop a motor vehicle upon any railroad crossing.” The law, however, does provide for a distinction between those who stop of their own volition and those who are trapped there by no fault of their own. After a review of the record, we find that genuine issues of material fact exist regarding whether: (1) The warning devices were operating properly at the time of the accident at issue; (2) Whether the train operator complied with LSA-R.S. 32:168 in timely warning motorists of his oncoming approach; (3) Whether Elkins violated her duty of vigilance at a railroad crossing; and (4) Whether the crossing at issue was a “dangerous trap.”
For the foregoing reasons, the judgment of the trial court is reversed.

REVERSED

CHEHARDY, J., Dissents for the reasons assigned by J. ROTHSCHILD.

. Bua v. Dressel, 96-79 (La.App. 5 Cir. 5/28/96), 675 So.2d 1191, writ denied, 96-1598 (La.9/27/96), 679 So.2d 1348 (citing Reynolds v. Select Properties, Ltd., 93-1480 (La.4/11/94), 634 So.2d 1180).

. Tassin v. City of Westwego, 95-307 (La.App. 5 Cir. 12/13/95), 665 So.2d 1272.

. Rowley v. Loupe, 96-918 (La.App. 5 Cir. 4/9/97), 694 So.2d 1006.

. Id. at 1008.

. J.W. Rombach, Inc. v. Parish of Jefferson, 95-829 (La.App. 5 Cir. 2/14/96), 670 So.2d 1305.

. 33,922 (La.App. 2 Cir. 11/1/00), 772 So.2d 268, 277-78.

. 33,810 (La.App. 2 Cir. 8/23/00), 766 So.2d 705, 714-15.