772 So.2d 268 (2000)
Charles Lloyd WILKERSON Individually & as the duly appointed tutor of his minor son, Charles Ryan Wilkerson, Plaintiffs-Appellees,
v.
The KANSAS CITY SOUTHERN RAILWAY and C.D. Lewis, Defendants-Appellants.
No. 33,922-CA.
Court of Appeal of Louisiana, Second Circuit.
November 1, 2000.
Rehearing Denied November 30, 2000.
*269 Mason L. Oswalt, Albert E. Loomis, Monroe, Elizabeth S. Hardy, Lake Charles, Counsel for Appellees.
Arthur R. Carmody, Jr., Shreveport, Counsel for Appellants.
Before STEWART, CARAWAY and DREW, JJ.
DREW, J.
In consolidated actions arising out of a fatal vehicle-train collision, the trial court rendered judgment based on the findings of the jury which concluded that the actions of the vehicle's driver, the railroad and the railroad's employees were proximate causes of the accident. The jury placed the percentages of fault at 60% on the driver and 40% on the railroad. All of the post-judgment motions were denied by the trial court. The railroad and its engineer appealed. All of the plaintiffs answered the appeal. After carefully reviewing the testimony and evidence, we find that the legal cause of this tragic accident was the driver's inattention. The judgment is affirmed in part and reversed in part.

FACTS AND PROCEDURAL BACKGROUND
On May 26, 1996, at approximately 6:15 P.M., C.E. Lewis was engineer on a Kansas City Southern Railway Company (KCS) train traveling west on tracks parallel to and just south of U.S. Highway 80 in Richland Parish. Catherine Rene Mills Wilkerson was driving her 1991 Suburban east on Highway 80 until she turned right on Branch Crossing Road and proceeded south to the crossing over the tracks. As she crossed the tracks, Mrs. Wilkerson's vehicle was struck broadside by the train. Severely injured, Mrs. Wilkerson died later that evening. The train engineer stated that she was talking and laughing on her car phone, was driving slowly and never slowed, looked or stopped before she drove onto the track in front of the train. She saw him and the train an instant before impact.
Suit No. 33,922-CA was brought by Charles Lloyd Wilkerson, decedent's husband, on his own behalf and as tutor for their child, Charles Ryan Wilkerson. Named defendants were Lewis, KCS, the *270 Richland Parish Police Jury (RPPJ) and Pierce Service Company. In Suit No. 33,923-CA, the plaintiffs were decedents' parents, Albert Kyle Mills, Jr. and Carolyn Virginia Mills, who were the first on the scene to find their daughter with her massive injuries. The Mills sued for their own damages and on behalf of decedent's two other children, Kenneth Peter Jacobs, Jr. and Sara Elizabeth Jacobs (plaintiffs' grandchildren of whom plaintiffs have legal custody). The same four defendants were named in the Mills' suit. Pursuant to a motion joined by all the plaintiffs, Pierce Service Co. was dismissed with prejudice from the action in a 1998 order which kept the terms of the settlement confidential and reserved plaintiffs' rights against the remaining defendants.
The actions were consolidated for trial which was conducted before a jury from March 29, 1999 until April 9, 1999. During the trial, the court announced to the jury that a settlement was reached between the plaintiffs and the RPPJ. A judgment dismissing the RPPJ from the law suits while reserving plaintiffs' rights against the other defendants was signed by the trial court. The jury found that the actions of KCS and its employees and of the decedent, Catherine Wilkerson, were proximate causes of the accident. The jury concluded that the RPPJ was not guilty of fault. The jury assessed Wilkerson with 60% fault and KCS with 40% fault. The jury awarded $100,000 for the survival action of the decedent (her pre-death pain and suffering). Decedent's husband was awarded $25,000 for loss of love and affection, $50,000 for mental anguish, $12,939.00 for medical and funeral expenses, and $54,000 for past and future loss of earnings and $0 for loss of past and future services. Decedent's three children, Charles Ryan Wilkerson, Kenneth Peter Jacobs, Jr. and Sara Elizabeth Jacobs, were each awarded $100,000 for loss of love and affection, $90,000 for mental anguish, $90,000 for past and future loss of support, and $20,000 for past and future loss of services. Decedent's parents, Albert Kyle Mills, Jr. ($125,000) and Carolyn Virginia Mills ($150,000) were awarded damages for their own mental anguish at the scene of the accident.
The plaintiffs filed a Motion for Judgment Notwithstanding the Verdict and, alternatively, for Additur or a New Trial on the issue of damages. The defendants filed their own motion for Judgment Notwithstanding the Verdict and in the alternative, sought Remittitur or a New Trial. After the trial court denied all the post-trial motions, KCS and Lewis appealed the judgment. The record was lodged in this court March 29, 2000. On April 6, 2000, all of the plaintiffs answered the appeal.

TESTIMONY
The engineer, Charles E. Lewis, testified the train which consisted of four locomotives and the cars was 1767 feet long and weighed 921 tons. Lewis properly sounded the train's horn as he approached the crossing where the accident occurred. The engineer first observed the Wilkerson vehicle when he saw her turn from the highway onto Branch Road leading south to the crossing. Mrs. Wilkerson was talking with a car phone in her hand and smiling. When Lewis realized from experience that she was not going to stop, he stood and placed the train into emergency stop. Lewis did not see the driver look up and see the train until her vehicle was in the center of the track. In Lewis's opinion, the driver was not trying to beat the train; she just did not see the train.
Lewis stated that the train had a digital speedometer and that his speed never exceeded 49 MPH before the accident. As he approached the crossing, Lewis properly sounded the horn by hitting it with his foot. The horn was blowing at impact and continued to blow until he "came to himself" and turned it off. Lewis was emphatic that he turned on the emergency brakes before the train struck the Wilkerson vehicle. The entire sequence took place in a matter of seconds.
*271 The conductor, H.K. Clark, testified the grade crossing collision occurred at 6:15 PM on the evening of May 28, 1996. Seated in the front seat on the left side of the locomotive, Clark first saw the Wilkerson vehicle about a second before impact and when about five feet of the fifteen foot long Suburban was already on the tracks. According to Clark, the vehicle was moving slowly and he observed the driver talking on the car phone. Clark acknowledged that his speed estimate of 10 MPH for the vehicle in his accident report was a guess. Although Clark could not say exactly when, Clark knew that Lewis had applied the emergency brake.
Trooper Michael Bickford measured the distance of the lead locomotive from the crossing at 1946 feet. The Wilkerson Suburban was 246 feet from the crossing, after having been pushed on the track 127.2 feet and having traveled an additional 119.4 feet. Bickford found no indication that the crew was tired or fatigued. The engineer voluntarily participated in an alcohol screen which showed no alcohol. The trooper found no obstructions to the view at the crossing.
Trooper Tim Grigsby stated the engineer informed him that the horn was properly sounded at the prescribed distance and that the driver was talking on a car phone and never looked. Grigsby found no defects or hazards in the roadway or the crossing. Grigsby learned from the crew that the train was going 48 to 49 MPH. His investigation revealed no sight obstructions for either the train or the vehicle. The trooper acknowledged he was unfamiliar with sight distances set out by AASHTO (American Association of State Highway and Transportation Officials) and the Railroad Grade Crossing Handbook or with the proper elevation rises for roadways by the American Railroad Engineering Association. The trooper also stated that the train crew fully cooperated and did everything requested of them.
Joe Michael McDonald was assistant director of safety rules and operating practices for KCS at the time of this accident. Among his duties was evaluation of data taken from event recorders in the locomotives. In this case the data was downloaded only from the lead locomotive and not the other three as required by company policy, but not federal law. While he did not know the reason, McDonald speculated that the KCS employee who did that job may not have had the type equipment to obtain data. Those locomotives belonged to another railroad and were being used by KCS, a common practice among railroads.
McDonald stated that right after the accident, he processed the data using an incorrect wheel size and came out with results showing locomotive speed (51 MPH) which was in excess of company rules (49 MPH). When he discovered that an incorrect size was used due to the method employed to measure the wheel, McDonald later found and correctly measured the inside of the wheel in order to properly calculate the data from the event recorder. The fact that the wheels had been turned and re-shaped in the interim did not affect McDonald's results because he measured the inside of the wheel. McDonald concluded that the train's speed and whistle blowing complied with regulations in effect. McDonald testified that the emergency brake was applied at or near the crossing. Further, he explained that the print out from the event recorder did not show exactly when the collision occurred.
Michael Van Tiem, a project engineer with the KCS signal department, testified that sight lines, road conditions and road width were all factors in the safety of a crossing. In the course of his employment, Van Tiem had evaluated thousands of KCS crossings and had never found one with an obstructed sight line provided that motorists complied with the legal requirement to stop within fifty to fifteen feet of the crossing, if necessary. Under federal *272 law, the trains have the right of way. Van Tiem confirmed that at KCS crossings equipped with flashing lights and gates, the drivers received 20 to 25 seconds warning of an approaching train. At other crossings, KCS's obligations were to give audible warning and have proper signage. The cross buck signs alert motorists that a train could be coming.
According to Van Tiem, there is no specific requirement for sight line clearance in Louisiana. Further, the sight line distances set out in the Highway Rail Grade Crossing Handbook and AASHTO were recommendations only. Work done at individual crossings depended on the particular circumstances present. Van Tiem testified that KCS road masters are responsible for all aspects of specific 100 mile sections of track including sight lines. Road masters traveled their track at least twice a week and took whatever action was necessary to resolve problems. Neither the Louisiana Department of Transportation and Development (DOTD) nor the Federal Railroad Administration (FRA) had ever made a complaint about the Branch Road crossing.
Larry Souter, the KCS Director of Safety Rules and Operating Practices, was general road foreman of engines at the time of the accident. Souter identified the January 1, 1996 order cancelling speed restrictions on KCS trains in the town of Rayville. Although Souter knew of no special actions such as the clearing of sight lines to compensate for the increase in speed, Souter stated that the railroad always maintained adequate sight lines at every crossing. In 1995 at a Senior Management meeting with the FRA, KCS was directed to evaluate their crossing using appropriate sight line triangulation. Souter did not know which sight line triangulation guidelines were used and explained that question should be directed to the engineering department.
Oliver Bret Waltman, KCS's engineer of maintenance, testified that one of the railroad's rules was that KCS should maintain road crossings and approaches to accommodate public roadway travel and keep the crossings free of obstructions. Generally, KCS cleared back 200 to 300 feet depending on the width of the right of way. KCS had no written rules on right of way clearing and took each crossing individually and cleared back adequately for drivers. When train speed was increased, KCS cleared more sight lines where needed including Richland Parish. Prior to the speed increase, the division managers and road masters (in charge of a certain portion of track which they inspected at least twice weekly) inspected their territories and did any necessary work prior to increasing the speed.
Gary Guin, a general claim agent for KCS, testified he examined the crossing and made photographs including the panoramic shots while standing in the middle of Branch Road. From 50 feet north of the north rail, the driver had a view over 300 feet. The photo Guin took 25 feet north of the north rail showed the driver's view east down the rail in the direction from which the train came. Guin was standing in the middle of the road, not in the grass. At 25 feet from the north rail, the driver could see at least five or six hundred feet down the track.
KCS road master, Lawrence B. Lang, explained that classes of track are derived from the FRA and that normally, the higher the class, the higher the permissible train speed. The track between Shreveport and Vicksburg including track through Rayville and the site of this accident is Class 4. Under FRA guidelines, the fastest permissible speeds are 60 MPH for freight trains and 70 MPH for passenger trains. The KCS maximum speed in the area of this accident was 49 MPH. The FRA does inspections of track conditions similar to those made by the railroads' own road masters.
The most recent FRA inspection of the portion of the track on which this collision occurred took place on May 17, 1996, eleven *273 days before the accident. Lang was present during that inspection which noted the track class was 4 and the speed was 49 MPH. No defects were found by the FRA at the Branch Road Crossing. In that inspection from Delta to Rayville, the only defect noted was in Delhi where a "frog" (an X in the middle of the track used for switching tracks) was worn down more than one half inch and required repair.
On cross-examination, Lang acknowledged that the railroad must maintain the tracks according to FRA standards and that the railroad set its own speed. As road master, Lang had authority to lower speeds if an obstruction such as vegetation or something parked by the track existed until the situation could be remedied. Their practice was to spray back to kill vegetation for at least 300 feet.
The Richland Parish Police Jury manager, Tommy Burgess, identified both a Richland Parish Police Jury resolution and a letter transmitting that resolution to KCS. Both requested that KCS trains sound their horns before and at all crossings and that KCS clear brush back 1000 feet at all crossings. Burgess testified that they received no response from KCS. The RPPJ maintained the right of way on Branch Road, but did no maintenance in the 150 foot wide KCS right of way that extended 75 feet from the center of the track in both directions. Burgess stated that there had never been a complaint from the schools or citizens regarding the crossing.
Patricia Ann Bell testified she was at work at the hospital when she received a call from Cathy Wilkerson who was on her car phone. Wilkerson requested the phone number of one of Bell's co-workers. While Bell was getting the phone number, the line went dead. Wilkerson called Bell back and asked if the number Wilkerson "read off" to Bell was the co-worker's correct telephone number. When Wilkerson called the first time, she did not know the number. When she called the second time, she had obtained the number, but did not tell Bell where. During a pause in the second call, Bell asked Wilkerson if she was alright. Wilkerson did not respond. Bell then heard her scream and the phone disconnected. Bell described the phone connection as very clear with no static. At no time during the conversations did Bell hear a train horn.
Christy L. McCormick testified that she lived within sight of the Branch Road crossing which she considered to be dangerous because she basically had to get on the track to see a train or to see a driver coming from the opposite direction. On cross examination, McCormick stated the state police photographs accurately represented the condition of the crossing at the time of the accident. She saw no pot holes or other problems in the road and knew of no other accidents at the crossing in 1995 and back to 1992.
Sharon Darnell testified that she used the crossing daily and that trees and vegetation were a daily problem. To see the train, she had to be almost on the track and the road itself was in bad condition. She was also distracted by the hump at the crossing over which she could not see cars coming from the other direction. Outside at the time of the accident talking to her father, Darnell does not recall hearing the horn but her father said he heard it. Darnell heard the squealing of the train's brakes, a collision and more train brakes. On cross examination, she identified her signed statement in which she said the train horn started blowing a quarter mile from the crossing. Darnell explained she copied the statement her father made and signed it.
Ruthell Williams testified she lived about one half mile on the Rayville side of the Branch Road crossing. At the time of the collision, she heard the train blowing for the crossing and also heard three short blasts of the horn, but did not know if those came before the crossing.
Charles Darnell testified he lived about a quarter mile from Branch Road crossing *274 over which he traveled daily. Darnell stated that a west bound train passed the crossing every day between five and six o'clock in the afternoon. Darnell heard the train horn start blowing in blasts about a quarter mile east of the crossing. Darnell also heard the impact and at about the same time the screeching of the brakes on the train. Darnell stated nothing was wrong with the crossing which had a little hump in it so a driver had to slow down and stop if a train was coming.
Carlette Cooper lived approximately a half mile to a mile from the Branch Road crossing which was visible from her home. Cooper testified she was outside the day of the accident and heard the impact. Cooper stated she knew a train was on the track because she heard the roar of the engine and the wheels on the track. However, she did not hear a horn or whistle before the crash.
Plaintiffs offered Dr. Kenneth Heathington as an expert civil engineer in the transportation field for the purpose of giving expert testimony concerning traffic engineering and human factors, accident reconstruction, and the relationship of engineering principles and human factors to railroad safety and accident causation. Heathington stated that among the guidelines and standards with which he evaluated the Branch Road railroad crossing were those of AASHTO and in the Railroad Grade Crossing Handbook. Dr. Heathington stated that AASHTO had devised a table based on the speed of both the train and the vehicle to calculate the appropriate sight distance; i.e., a length to permit the driver an unobstructed view sufficient to avoid collisions. In an unexpected situation, Heathington stated the perception reaction time for a driver to see, interpret, evaluate and react is 2.5 seconds, the figure used in the Railroad Grade Crossing Handbook. Sufficient sight distance allows the driver to perceive and react to the train and skid to a halt at least 15 feet from the rail.
Dr. Heathington stated that automobile traffic over the crossing averaged 402 a day and that an average of 8 to 10 trains passed the crossing. The witness agreed that 402 was a low traffic count and typical for a rural or semi-rural crossing in Louisiana. Heathington also considered that a driver had to make a 90 degree turn off of Highway 80 to enter Branch Road and stated the hump over the crossing exceeded the American Railway Engineering Association standards by 400%. Dr. Heathington disputed testimony that the hump would make a driver more careful and stated the hump made the crossing more dangerous because drivers concentrated on avoiding rough spots in the road and looking for oncoming traffic. Further, Dr. Heathington's opinion was that sound was not an adequate warning for a motorist and should only be a secondary warning. He also opined that Wilkerson's familiarity with the crossing over which she had to pass to reach her parents' home could have been a detriment if the driver was not expecting a train.
Based upon the various standards used, Dr. Heathington concluded that there was insufficient sight distance to give a driver time and space to stop legally and correctly before the driver reached the track. For Wilkerson's car traveling at 10 MPH, Heathington concluded that she needed to see the train at 711 feet from the crossing, but that at this crossing the tree line began about 250 feet from the crossing.
Heathington's opinion was that the crossing did not meet standards and should have been made an active crossing with flashing lights or gates giving at least a 20 second warning for the train. Heathington further concluded that the accident occurred because there were no flashing lights or traffic control gates at this crossing. Dr. Heathington dismissed the car phone as a factor in this wreck because he opined that almost anything such as a radio or a child in the car could distract the driver. Also Heathington opined that had the trees and vegetation been cut *275 back 1000 feet from the crossing, there would have been no sight line obstructions.
In response by questioning from KCS counsel, Heathington did not deny that a recent National Transportation Safety Board study found that the overwhelming majority of accidents at passive crossings (one marked with cross buck signs, like Branch Road crossing) were caused by driver inattention and the second cause was drivers trying to beat trains with no finding that sight obstructions and sight view were significant factors. However, his opinion was that sight distance was the primary consideration at passive crossings such as the Branch Road crossing which had no train activated warning devices. Heathington acknowledged that no accidents had occurred at that crossing from 1990 though 1995, that school buses used that crossing and that he was aware of no reports of problems with the crossing from any type of vehicle. Heathington admitted that in every case in which he gave testimony the previous year, his testimony had been against the railroad.
Jimmy Calvin Scott, a former railroad employee with a consulting business, was accepted as an expert for the plaintiffs in train and railroad operations. In his opinion, KCS did not provide an adequate audible or visual warning for Wilkerson. Scott opined that the train was speeding and, had the train not been speeding, it would have been a half mile back from the crossing when Wilkerson passed over the rails. Further, had the slow order for the city of Rayville not been revoked, the train would have been in the process of slowing its speed to pass through Rayville. Scott testified there was no emergency whistle sounded and the train was not placed in emergency stopping mode prior to impact. Scott's reading of the event recorder was that the train was in emergency stop for 1740 feet. Since the state police found that the lead locomotive was 1948 feet past the crossing, Scott concluded that the emergency stop was not made until 206 feet after the collision. Scott stated the event recorder records immediately.
Scott also indicated sand should have been on the crossing if the train was in emergency stop mode at the crossing. Trooper Grigsby testified he did not look for sand at the accident site. During the engineer's testimony, Lewis explained the lack of sand on the crossing was because only a minute amount of sand was emitted when the train was placed into emergency; and, the train itself, other vehicles and the wind dispersed it.
On cross examination, Scott stated that he did not consider the actions of the motorist and was not asked to evaluate the vehicle's driver in any of the consultations he had done. Scott acknowledged that the differences in the wheel measurements, which KCS attributed to different measuring methods, accounted for a difference of just one or two MPH. Further, there were no problems with the horn on this locomotive within the 90 days prior to this accident. Scott also stated the FRA report had nothing indicating there was a problem with this crossing.
Accepted as an expert in accident reconstruction, highway and railroad crossing standards design and designs, highway and railroad grade crossing safety and human factors, Dr. William Fogarty testified that he did consulting work for both plaintiffs and defendants at percentages that ranged from 60/40% to 50/50%. In reconstructing this accident, Fogarty concluded that Wilkerson had clear opportunity to see the train, to react and to bring her vehicle to a halt safely. For purposes of his reconstruction, Dr. Fogarty assumed that the train's speed was 49 MPH and Wilkerson's was 10 MPH. He also assumed that the train was placed into emergency stop by the engineer at or near the point of impact. Dr. Fogarty explained that from the time the emergency brake was applied, there was a time lag for the air in the brakes to travel the length of the train. The event recorder indicated braking *276 when braking commenced after the lag time.
According to Fogarty, when the locomotive was visible, Wilkerson was 72 feet from the rail and had five and one half seconds until both the train and the car reached the crossing. Normal reaction time for the driver is 2 and a half seconds. A car going 10 MPH travels 15 feet per second. Braking at that speed requires 10 feet for a comfortable stop so the driver would have time (3 and a half seconds) and space (53 feet) to stop before the crossing. Fogarty pointed out that emergency reaction time for drivers is 1½ seconds average and a hard stop at 10 MPH can be made in 5 feet which would bring the driver to a halt even further from the track. Dr. Fogarty concluded that the primary causal factor in this accident was driver inattention (that is, not seeing what is there to see) with a contributing factor being use of the cellular phone.
Dr. Fogarty stated that tractor-trailer trucks take about double the distance to stop on a wet surface than a car does on a dry surface. Dr. Fogarty stated that Dr. Heathington's analysis was for a tractor trailer in the rain. Finally, Dr. Fogarty stated that from 50 feet from the crossing, Wilkerson could see the sixteen foot high train about 340 feet down the train. From 25 feet away, Wilkerson could see almost 500 feet down the track. He based his opinion that she did not look at all on the fact that there was no evidence of evasive action on her part.
Dr. Dennis A. Guenther, accepted as an expert in perception reaction time, human factors including distractors and accident reconstruction, testified that the driver's eye height in the 1991 Suburban involved was from 5' to 5' 5" or 5' 6". This contrasted with AASHTO's use of driver's eye height of 3' 6" in the recommendations relied upon by Dr. Heathington. Dr. Guenther reported that studies have shown an increase in driver accidents using a cell phone driving on the open highways. Dr. Guenther opined that Wilkerson's use of the cell phone diminished or prohibited the driver's ability to perceive and react to the approaching train.

DISCUSSION
On appeal, the defendants contend that the jury erred in finding liability on the railroad because the sole cause of the car/train collision was Wilkerson's negligence in talking on her cell phone, failing to look and to stop at the crossing and failing to yield to the train which was clearly visible. Based thereon, the defendants also assert that the trial court erred in failing to grant their Motion for Judgment Notwithstanding the Verdict. Additional defense complaints are (1) refusal of the trial court to grant several motions for mistrial based upon alleged passion and prejudice against the railroad in the community, (2) the awards of excessive damages and (3) the assessment of all costs against KCS.
The plaintiffs, who answered the appeal, acknowledge that Wilkerson's conduct contributed to the accident and that the decedent made an error in judgment. However, they assert that fault should be reallocated to place a minimum of 70% of the fault on the defendants and a maximum of 30% of the fault on Wilkerson. In their view, the defendants did not provide Wilkerson adequate audible or visual warnings of the approaching train at the unreasonably dangerous crossing. In addition the plaintiffs complain that the damages awarded were inadequate.
Our review of this record shows that the fault for this horrific tragedy lies with the inattentive driver who drove into the path of the oncoming train. Concerning negligence, a duty-risk analysis determines whether liability exists under the facts of a particular case. A plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by *277 the duty breached. All four inquiries must be affirmatively answered for plaintiff to recover. Mathieu v. Imperial Toy Corp., 94-0952, (La.11/30/94), 646 So.2d 318.
In Kendrick v. Louisiana and North West Railroad Co., 33,810 (La.App.2d Cir.8/23/2000), 766 So.2d 705, this court set out the responsibilities of the driver and the railroad. Generally, a motorist must maintain reasonable and proper control of her vehicle at all times. The duties of a driver approaching a railroad crossing are stated in La. R.S. 32:171 which provides, in pertinent part:
A. Whenever any person driving a motor vehicle approaches a railroad grade crossing under any of the circumstances stated in this Section, the driver of such vehicle shall stop within fifty feet but not less than fifteen feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:
* * *
(3) A railroad train approaching within approximately nine hundred feet of the highway crossing emits a signal in accordance with R.S. 32:168, and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard.
(4) An approaching railroad train is plainly visible and is in hazardous proximity to such crossing.
* * *
E. At any railroad grade crossing provided with railroad cross buck signs, without automatic, electric, or mechanical signal devices, crossing gates, or a human flagman giving a signal of the approach or passage of a train, the driver of a vehicle shall in obedience to the railroad cross buck sign, yield the right-of-way and slow down to a speed reasonable for the existing conditions and shall stop, if required for safety, at a clearly marked stopped line or, if no line, within fifty feet but not less than fifteen feet from the nearest rail of the railroad and shall not proceed until he or she can do so safely. If a driver is involved in a collision at a railroad crossing or interferes with the movement of a train after driving past the railroad cross buck sign, the collision or interference is prima facie evidence of the driver's failure to yield the right of way.
La. R.S. 32:175 provides, in pertinent part:
A. The driver or operator of a vehicle approaching a rail-highway grade crossing identified by the presence of a railroad cross buck sign shall slow down to a speed reasonable for the existing conditions, or shall stop if necessary, before entering the cross walk on the near side of the intersection or, in the event there is no cross walk, at a clearly marked stop line, or if none, then at the point nearest the intersecting rail of such railroad where the driver or operator has a clear view of any approaching train. The driver or operator shall listen and look in both directions along such track for any approaching train and for signals indicating the approach of a train. Having slowed or stopped in this manner, the driver or operator shall yield the right of way to any approaching train and then shall proceed only upon exercising due care and upon being sure that it is safe to proceed.
* * *
C. The provisions of this Section do not relieve drivers or operators of the responsibility to comply with the provisions of R.S. 32:171 and 32:173.
A motorist approaching a railroad crossing has a heightened duty of care. The motorist must use her senses of sight and hearing for possible approaching trains. LeJeune v. Union Pacific R.R., 97-1843 (La.4/14/98), 712 So.2d 491; Rivere v. Union Pacific R. Co., 93-1132 (La. App. 1st Cir.10/7/94), 647 So.2d 1140, writ *278 denied, 95-0292 (La.3/24/95), 651 So.2d 295. A motorist is presumed to have heard and seen what she "could have heard and seen." Kendrick, supra. The law does not require motorists to stop at every railroad crossing, but a driver cannot expect to drive with impunity through a railroad crossing where her view is obstructed; instead, a motorist must keep her vehicle under such control as to be able to stop immediately upon spotting an oncoming train. Furthermore, if a motorist's view is obstructed as she approaches a railroad crossing, she must exercise an even higher degree of caution. Kendrick, supra.
Our supreme court, in LeJeune, supra, explained the train crew's duties as follows:
The statutory duties imposed on the railroad and its employees regarding railroad grade crossings ... are twofold. La. R.S. 32:169 requires the railroad to erect cross buck signs not more than fifty feet nor less than fifteen feet from crossings. Moreover, La. R.S. 32:168 imposes an affirmative duty on the train crew to blow the train's horn continuously from at least 300 yards out until the train reaches the crossing. A corresponding duty is placed on motorists by La. R.S. 32:171 to stop whenever a train within 900 feet of a crossing blows its horn and poses an immediate hazard because of its speed or proximity to the crossing.
It is well established in our jurisprudence that a train crew can presume that vehicles approaching railroad crossings will obey the law and stop in time to avoid an accident. The train need not slow down at all or attempt to stop upon seeing a vehicle approaching an upcoming crossing. It is only if a crew member notices that "the driver of the approaching car is oblivious of the oncoming train or for some other reason does not intend to stop" that the train crew becomes responsible for immediately doing everything in its power to avert the collision. In other words, "the train crew can assume drivers will bring their vehicles to a stop ... unless the vehicle's approach is so unusual as to place an ordinarily prudent man on notice the vehicle cannot be brought to a stop in time to avoid a collision." Thus, the train crew's duty was to do everything in its power to stop the train once a crew member could no longer reasonably believe that LeJeune would be able to stop the ambulance and that a collision was imminent. (Internal citations omitted.)
The photos in evidence and the witnesses' testimony established that the crossbuck signs mandated by La. R.S. 32:169 were in place at this crossing and provided a passive warning of the presence of the railroad crossing. In addition Wilkerson's approach to the crossing on Branch Road contained a yellow RXR sign warning of the presence of the railroad crossing. Relying on Whitehead v. Kansas City Southern Ry. Co., 99-896 (La.App. 3d Cir.12/22/99), 758 So.2d 211, the plaintiffs urge that a crossbuck sign warning was not tantamount to warning of an approaching train. However, KCS provided the statutorily required signs and met its duty to warn Wilkerson of the presence of the tracks.
The plaintiffs maintain that audible warnings of approaching trains are inadequate based upon studies showing that drivers ordinarily do not hear a train horn until 2 to 3 seconds before a train reaches a crossing. Under La. R.S. 32:168 the train crew must sound a bell or whistle for at least three hundred yards before reaching a crossing. The engineer testified that the horn was blown properly beginning at the whistle post alerting the train crew to the upcoming crossing. The horn continued blowing until the engineer turned it off after the accident. The plaintiffs presented testimony from James Tibbs, Patricia Bell, Carlette Cooper and Sharon Darnell, all of whom stated they did not hear a train horn or whistle. Darnell stated she *279 heard the train's brakes, the impact and more train brakes. Darnell's father, Charles was talking to her when the accident occurred. He testified that the horn was sounded a quarter mile before the crossing. Ruthell Williams, who lives nearby, did not witness the accident but heard the horn. McDonald, the assistant director of safety rules for KCS who analyzed the event record, concluded that the horn functioned properly. The print out from the event record itself showed that the horn was sounding beginning at 14 minutes 41 or 42 seconds after 6 PM.
The parties dispute the speed of the train. Relying on the initial event recorder data, the plaintiffs assert that the train was traveling 51 MPH, or two miles above the KCS speed limit for that section of track. KCS explained that the incorrect wheel size was used in that analysis and the correct analysis shows the train's speed was 49 MPH.
The plaintiffs contend that the crossing itself was a dangerous trap. In Fry v. Southern Pacific Transp. Co., 30540 (La.App.2d Cir.6/24/98), 715 So.2d 632, this court explained that a railroad crossing is considered unusually dangerous when the view of the motorist is so obstructed as to require that he place himself in a position of peril precariously near the tracks before he has a view of the oncoming train. In such circumstances, the railroad company will be held liable unless it can show that it took unusual precautions, such as reducing the speed of the train, or increasing its warning devices. The lack of an unreasonably dangerous condition implies the absence of a duty on the part of a defendant. Just because an accident occurs does not create the presumption that defects are present. Fry, supra.
The expert for the plaintiffs, Dr. Heathington, relied on recommendations of AASHTO (American Association of State Highway and Transportation Officials) and the Railgrade Crossing Handbook to conclude that the sight distances available to Wilkerson at this crossing were deficient by 45%. According to Heathington, Wilkerson at 10 MPH and 70 feet from the crossing should have been able to see 711 feet down the track but could see only 389 feet. In plaintiffs' view, that deficiency created an unreasonable risk of harm. Although the investigating state troopers found no obstructions in visibility and nothing wrong with the crossing, the troopers stated they were unfamiliar with and had not used the foregoing standards to evaluate the crossing.
Dr. Heathington also opined that the crossing was dangerous because of the elevated hump going over the track. In his view, the hump was a distraction to Wilkerson which interfered with her ability to see the train. Another factor cited by Heathington as a danger to the crossing was the fact that Highway 80 ran parallel to the track and the motorist had to made a 90 degree turn to approach the track which also was a distraction. The rough surface of the road itself was another dangerous condition noted. Plaintiffs also contended the danger of the crossing increased when KCS cancelled a slow order (increasing the speed of trains from 25 MPH to 49 MPH) in the town of Rayville a short distance from the Branch Road Crossing. In plaintiffs' view, had the slow order been in effect, this train would have been slowing as it approached the Branch Road crossing.
The plaintiffs argue that the Branch Road crossing was a dangerous trap for Wilkerson because it was unreasonably dangerous due to the factors discussed by Dr. Heathington, because KCS knew about the existence of the dangerous conditions and because KCS did nothing to correct the dangers. Therefore, KCS is responsible, in part, for this tragedy because it violated its duty to provide a safe crossing for the motoring public.
The record shows that the Branch Road crossing was not a dangerous trap. Testifying for KCS, Dr. Fogarty's conclusion that the accident was caused by Wilkerson's *280 inattention was based upon his reconstruction of the accident which demonstrated that had she looked, she had time to safely stop her vehicle and avoid the collision. There was no evidence that Wilkerson did anything to avoid the collision or to take any evasive action. She simply did not look and observe the oncoming train. Further, the photos taken a day or two after the accident belie the assertion that this intersection was unreasonably dangerous and show that a driver should have had ample visibility by which to navigate the crossing safely.
Although plaintiffs deny that KCS complied with the statutory requirements placed upon the railroad by the state of Louisiana, plaintiffs correctly contend that the inquiry into defendants' liability does not end with a finding of statutory compliance. KCS clearly had a duty to maintain a safe crossing for the protection of the motoring public. However, for KCS and Lewis to be liable for the plaintiffs's damages, defendant's actions had to be a cause in fact of the harm.
The jury erred in finding that KCS and Lewis were 40% at fault. This court's review is governed by the manifest error/clearly wrong standard; this court may reverse only if we find no reasonable factual bases exist for the trier of fact's findings which are clearly wrong or manifestly erroneous. That appellate standard of review leaves reasonable evaluations of credibility and inferences of fact to the discretion of the trier of fact. When those determinations are clearly wrong, this court must reverse. Kendrick, supra.
Notwithstanding the complaints about the condition of the crossing itself and the visibility available, Wilkerson did not look and stop her vehicle within fifty to fifteen feet of the track. If she had done so, she would be alive today. The crossing was properly marked to alert Wilkerson to the presence of the tracks and the possibility of a train. The train crew properly sounded the audible warning and the train was plainly visible at a sufficient distance for Wilkerson, had she looked, to avoid the collision. Even if the crossing itself had been flat, even if the right of way had been cleared back to 1000 feet, even if the slow order in Rayville had not been cancelled in early 1996, even if the audible warning had been better and louder, those factors and others relied upon by the plaintiffs were not causes in fact of this tragedy. Although Wilkerson was proceeding slowly, she was distracted by her cell phone conversation and did not approach the crossing with heightened caution. Tragically for herself and her loved ones, she did not see what she could have seen, nor heard what she should have heard, had she looked and listened. Wilkerson's sad and untimely death was caused by her own inattention and not by any actions or inactions on the part of the railroad or the engineer, Lewis.
Based upon the finding that this accident was caused by the driver's inattention, a discussion of the remaining issues is pretermitted.

DECREE
For the foregoing reasons, the judgment of the trial court is reversed with respect to the finding of liability on the part of defendants KCS and C.E. Lewis, the engineer. Accordingly, those portions of the judgment in favor of plaintiffs and against defendants are reversed. Costs are taxed to plaintiffs.
REVERSED IN PART AND AFFIRMED IN PART.

APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, GASKINS, CARAWAY, and DREW, JJ.
Rehearing denied.