| PEATROSS, J.
This appeal arises from a judgment denying the Department of Social Services, Office of Community Services’ (“Department”) Motion to Limit and/or Stop Contact between the minor child, J.S.W., and his biological mother, Jacklin Marie Cur-ran Reuther, after termination of the mother’s parental rights and while J.S.W. is awaiting an opportunity for adoption. The Department appeals the denial of its motion; and, for the reasons stated herein, we reverse the judgment of the trial court *1200 and enter judgment as prayed for by the Department reducing contact between J.S.W. and his biological mother to once quarterly rather than three times per month.

FACTS

This is the second time this matter has come before this court. In the recent opinion of State in the Interest of D.S.C., S.W.C. and J.S.W. v. J.C.R., M.H.W. and A.R.S., 35,893 (La.App.2d Cir.2/27/02), 811 So.2d 198, a panel of this court affirmed the trial court’s termination of J.S.W.’s mother’s parental rights.
J.S.W., now 11 years old, has had a very unfortunate childhood thus far. He has been in the custody of the Department since September 16, 1993, when J.S.W. was one month shy of three years old. He has severe emotional and behavioral problems, with which his mother admittedly could not deal.[1] The trial court’s judgment terminating the mother’s parental rights, however, ordered that there be continuing contact under La. Ch.C. | j>art. 1037.1 between her and J.S.W. until the child is adopted. At that time, J.S.W. was visiting with his mother for one hour three times per month.
Immediately following the termination judgment, in July 2001, the frequency of the visits was decreased by the Department to once quarterly to coincide with the visits of J.S.W.’s twin brothers.[2] At a status review hearing on August 13, 2001, however, the trial court agreed with counsel for the mother that the frequency of the visits should be maintained at three times per month pending the decision of this court in the appeal of the termination judgment. Thereafter, on September 27, 2001, while still awaiting decision of this court on the termination judgment, the Department filed a Motion to Stop and/or Limit Contact between J.S.W. and his mother. The motion alleged that it was not in J.S.W.’s best interest to continue to visit his mother on a three times per month basis. This allegation was supported by the opinion of J.S.W.’s treating therapist at the time, Shelley Booker. Attached to the motion was a letter written by Ms. Booker to Pat Cover and Renee Clary of the Department expressing her “grave concern” over such frequent visitations between J.S.W. and his mother. In this letter, Ms. Booker explained:
I want to express my deep concerns about the decision to have [J.S.W.] visit on a three [times] a month basis. I believe this will not only be detrimental to his mental health but very confusing for [J.S.W.]. [J.S.W.] is going to be asked to continue a relationship with [his biological mother], whose parental rights have been terminated while we expect him to bond to his foster family, and additionally begin to explore ^adoptive possibilities. I think this is overwhelming for most human beings, but particularly for [J.S.W.] due to his *1201 fragile emotional state. What [J.S.W.] needs most now is developing stability, consistency and positive interpersonal relationships and this will not be accomplished with continuing a chaotic visitation schedule with his biological family whose rights have been terminated.... I do believe this will be very harmful to [J.S.W.]
Ms. Booker reiterated her opinion in her testimony at the hearing of the motion on February 12, 2002. Ms. Booker, accepted as an expert in child and adolescent psychiatric issues, testified that she had counseled J.S.W. on a weekly basis since May 1999. She stated that J.S.W. has selective or elective mutism, which means that he exhibits periods of very aggressive or violent behavior during which he does not communicate at all. When J.S.W. is emotionally distressed, he sometimes reverts to the fetal position. Ms. Booker further testified that in July and August 2001, immediately following the termination judgment when J.S.W. did not visit with his mother three times per month,[3] his behavior improved and J.S.W. was positive about the possibility of adoption. According to Ms. Booker, during that time, J.S.W. was “able to kind of settle down and start focusing.” Ms. Booker further testified:
Q: Then once the Court terminated the mother’s parental rights and he’s still maintaining that three times a month contact, what harm have you seen, or do you see, in that continued contact to this child?
A: The main harm for [J.S.W.] is that he is still continually living in a state of confusion. We’re asking him to attach to this foster family that he’s been in. We’re asking him to have three times a week visita- ■ tion with [his mother].
|4 We’re asking [J.S.W.] at some point to begin the adoptive process. And in the adoptive process, what the agency does is do a lot of PR and work with him on that.
So, in essence [J.S.W.], who is 11 years old, and that is his chronological age, certainly nowhere near his developmental or emotional age, we’re asking him to attach to three or four different entities, different families. He is constantly confused.
I will tell you that his foster mom, Ms. Johnson and I work very closely together, and we contract [sic] there is a definite pattern of aggressive behavior around the visitation with his birth family. In fact, the periods of aggressive behavior in the last month or two have become so severe that they have jeopardized the current placement for [J.S.W.].
Ms. Booker continued, restating that there is a definite pattern between the visits and J.S.W.’s poor behavior and expressing much concern that “the stable placement he has right now may be disrupted if the extensive visitation is continued.” While Ms. Booker opined that [J.S.W.] has severe emotional and behavioral problems that will not likely disappear with reduced or terminated visitation with his mother, she emphatically stated that his aggressive impulses are directly linked to the visitations and that “we have noticed a great degree, a great lessening of the acting out behavior when the visitations are not occurring regularly.”
J.S.W. has been living in the foster family of Edna Johnson since November 2000. Ms. Johnson also testified regarding J.S.W.’s behavior, relating that he some *1202 times becomes physically violent, punching and kicking the walls and tearing up an entire room; urinating on the floor and walls; and destroying furnishings. He has also attempted to run away and has stolen items from stores while Ms. Johnson was shopping. Ms. Johnson [¿further testified that J.S.W.’s outbursts were worse immediately before and for some time after his visits with his mother, which occur the first, third and fourth Thursday of each month. When questioned about changes in [J.S.W.’s] behavior following visits with his mother, Ms. Johnson testified:
I mean it’s been like that since he’s been in my home after each of the visits. There was a change in him because his behavior would become, he would become belligerent, defiant, oppositional, would not want to respond. He would have temper tantrums complete with under the bed, kicking, scream, the whole nine yards. Yes, those happened after the visits.
:|: * *
Sometimes the behavior will start that next day if not that same evening after we’re back home [from the visit]. It will go through the weekend through the Sunday, and usually after he has a major outburst, then he will settle back down. I would say maybe into Monday he would start settling, and you could see a difference.
Ms. Johnson further testified that J.S.W. was more compliant when fewer visits occurred and she did not experience this type of disruptive behavior during periods of no visitation.
Both Ms. Booker and Ms. Johnson testified that the mother’s gift giving at the visits was also problematic. The giving of gifts created behavior problems for J.S.W. when he left the visits and seemed to be rewarding his destructive behavior. Ms. Booker testified that it is her belief that J.S.W.’s expressed desire to continue the visits with his mother is colored by the prospect of receiving gifts. She further testified that he does not ask about when he will be visiting his mother and, in fact, “[h]e’s even gotten physically sick on the days of a visit.”
|fiIn Ms. Booker’s opinion, J.S.W. needs stability in his life; and, since the mother’s rights have been terminated, J.S.W. should be allowed to move forward and form new attachments to his foster and/or adoptive families without the confusion of remaining tied to his biological mother. When questioned about whether it was possible that J.S.W.’s behavior was the result of separation anxiety from being separated from his biological mother, Ms. Booker emphatically answered in the negative. She opined, rather, that J.S.W. suffers from attachment disorder from never having bonded or attached to a parental figure at all. It was Ms. Booker’s recommendation that contact with the mother be stopped or at least limited to once per quarter, which is the contact currently occurring between the mother and J.S.W.’s twin brothers, with whom J.S.W. does have a strong bond.[4]
Finally, as mentioned earlier in our discussion of Ms. Booker’s testimony, Ms. Johnson testified that, under the current circumstances, she was not considering adopting J.S.W. She did state, however, that her intentions could change if the visitation schedule decreased and J.S.W.’s *1203 behavior improved. Further, Ms. Johnson “didn’t know” whether J.S.W.’s current foster placement in her home could continue if the visits were not decreased. All parties agree that the current placement with Ms. Johnson has been the most stable and long-lasting placement for J.S.W. and |7Ms. Booker testified that it would be harmful to J.S.W. for this placement to be disrupted.
On the other hand, the mother also testified at the hearing, stating that she cooperated with the requests of Ms. Johnson to stop giving elaborate gifts to J.S.W. at the visits. She further testified that she communicated with Ms. Johnson on efforts to reinforce good behavior and not reward bad behavior. J.S.W. briefly testified that he wanted to continue the visits with his mother because he loves her and not because she gives him gifts at the visits.
In oral reasons for judgment at the conclusion of the hearing, the trial court opined that J.S.W. “is made better by the fact that he knows that his family, his natural family, is doing well and has a natural bond with his mother and his brothers and sister.” The trial court then ordered that the level of visitation with the mother be maintained.[5] This court’s opinion affirming the termination of the mother’s parental rights was rendered on February 27, 2002, and the trial court entered written judgment on March 8, 2002, denying the Department’s motion to discontinue or decrease the frequency of contact. This appeal ensued.

DISCUSSION

La. Ch. C. art. 1037.1, enacted in 1997, provides as follows:
A. Subsequent to a termination of parental rights judgment when custody is granted to the department, the court may order continuing contact between the child and the parent, sibling, or IsQther biological relative. The court may grant such an order only after it makes finding (sic) of fact that continuing contact is in the best interest of the child. The court may receive expert testimony on the issue of continuing contact.
B. Any order for continuing contact shall remain in effect until the order is modified in accordance with Paragraph C of this Article, or the final decree of adoption is rendered.
C. Any order of continuing contact remains modifiable and shall be reviewed in the subsequent hearings required by Chapter 10 of this Title.
While there is no jurisprudence applying this article to a similar case, the comments to this article provide some guidance as to its intended application. The comments describe the contact contemplated by the legislature as “a limited form of contact with the parent [that] may be critical to the child’s adjustment in foster care while awaiting transition to a permanent home through adoption.” In the case sub judice, we note that J.S.W. has been in foster care for most of his life and, therefore, is clearly not in a transition mode from his “birth home” to a foster home. The comments go on to explain as follows:
Paragraph A does not recognize any new entitlement of a member of the child’s biological family to contact with the child nor are those relatives’ interest *1204 relevant to the determination. Here the issue of continued contact between the child and any biological relative is left to the discretion of the court, guided only by consideration of the child’s best interest.
The most recent comment (2001) states:
Ordering interim continuing contact between a child and his biological relatives is not always appropriate and thus should be neither routinely ordered nor invariably denied. The decision requires sufficient information about the strength, nurturing value, and duration of the particular child’s previous relationships with biological family members and his or her needs in the foreseeable future in order for the court to make a reasonable determination that maintaining contact pending [9adoption serves the child’s best interests. This Article provides for continuing contact for only so long as the child is awaiting adoption. Once a final decree of adoption is entered, continuing contact is governed by the provisions of Chapter 14-A of Title XII of this Code.
The Department argues that the evidence showed that J.S.W.’s behavior deteriorated after the visits and that his destructive behavior, due in large part to the frequency of the visits with his mother, is not only jeopardizing his current foster placement, but is also a hindrance in the adoption process. The Department strenuously asserts that it is not in J.S.W.’s best interest to have three visits per month with his mother. We agree.
We recognize that our review of the trial court’s findings in this case is governed by the manifest error standard of review. Rosell v. ESCO, 549 So.2d 840 (La.1989); Webb v. Lagniappe Hospital Corporation, 30-659 (La.App.2d Cir.6/24/98), 714 So.2d 901. Under this standard, the reviewing court may reverse only if it finds that no reasonable factual bases exist for the findings of the trial court which are clearly wrong or manifestly erroneous. Payne v. Lawn Lourd Lawn Service, 35,491 (La.App.2d Cir.12/5/01), 803 So.2d 321; Wilkerson v. Kansas City Southern Ry., 33,922 (La. App.2d Cir.11/1/00), 772 So.2d 268, writ denied, 00-3526 (La.2/16/01), 786 So.2d 105. In the case sub judice, we find that the trial court was clearly wrong in allowing continued contact between J.S.W. and his mother on a three times per month basis. All of the testimony adduced at the hearing on the motion that spoke directly to the issue of the frequency of the contact was extremely critical of such frequent contact. Both |inMs. Booker and Ms. Johnson expressed grave concern over the well-being of J.S.W. and the stability of his current placement and prospect for adoption if the contact continues at three times per month. The evidence was clear that J.S.W.’s behavior deteriorated in the days surrounding the visits; and, with the visits occurring practically every week, as soon as J.S.W. would start settling down from one visit, it was time for the next visit. Under the current schedule of contact, we agree with the expert that J.S.W. will never become emotionally stable enough to bond with a foster family or a potential adoptive family, which is this child’s only chance at this juncture for a healthy, normal future. In its brief, the Department requests the following relief:
The Department prays that this Honorable Court find that the trial court committed manifest error in refusing to decrease J.W.’s visitation with his mother, Jacklin Curran Reuther, to once quarterly; and that this Honorable Court reduce the visitation to once quarterly.
It is the opinion of this court that a once quarterly visit with his biological family will provide the requisite contact to allow J.S.W. to satisfy any need for assurance of his natural family’s well-being and allow *1205 him to remain in contact with his siblings. In addition, the longer periods of time between visits will hopefully decrease if not eliminate the confusion and almost constant cycle of destructive and aggressive behavior that J.S.W. suffers as a result of weekly visits with his mother. We, therefore, reverse the judgment of the trial court and render judgment as prayed for in favor of the Department reducing the contact between J.S.W. and his mother to once quarterly, preferably at the same time as the visits of his brothers.

^CONCLUSION

For the foregoing reasons, the judgment of the trial court denying the Department’s Motion to Limit/and or Stop Contact between J.S.W. and his biological mother is reversed. Judgment is rendered in favor of the Department on that motion and the contact between J.S.W. and his biological mother is hereby decreased from three visits per month to one visit per quarter. Costs are assessed against Appellee, Jack-lin Marie Curran Reuther.
REVERSED AND RENDERED.

. There had been two attempted trial placements of J.S.W. back into his mother’s home, both of which ended tragically. At the termination trial, all experts agreed that it would be devastating to J.S.W. to suffer yet a third failed placement with his mother. For an in-depth discussion of the circumstances precipitating J.S.W.’s coming into the care of the Department and the reasons underlying the termination of his mother's parental rights, see State in the Interest of D.S.C., S.W.C. and J.S.W. v. J.C.R., M.H.W. and A.R.S., supra.

. D.S.C. and S.W.C. are the younger twin brothers of J.S.W. and were taken into the care of the Department at the same time as J.S.W. Despite the fact that D.S.C. has severe and permanent brain damage from abuse suffered while in the custody of his mother, according to expert testimony, the three boys share the only bond that J.S.W. enjoys with any member of his biological family.

. There is some dispute as to how long this period was and the testimony is somewhat inconsistent, but it appears to have been a month to six week time period during which there was one visit.

. J.S.W.’s twin brothers visit once quarterly with the mother. (Her parental rights as to the twins were terminated by stipulation during the termination trial.) The experts testifying at the hearing and at the termination trial agreed that J.S.W. does enjoy a bond with his brothers. Ms. Booker opined that J.S.W.'s visiting with his brothers once quarterly would not be detrimental to him.

. The trial court relied on expert testimony, apparently from the termination trial, in so ruling. At the termination , trial, Terry Theaux, mental health counselor, testified that J.S.W., as with all children, has fears about the well-being of his biological family and it was, therefore, possible that not seeing his mother would be detrimental to him. Ms. Theaux further testified that some contact would probably help J.S.W. by allaying such fears.